**The PEOPLE of the State of Colorado,**
**Plaintiff–Appellant,**

v.

**Charles Earl GENNINGS,**
**Defendant–Appellee.**

**No. 90SA44.**

Supreme Court of Colorado,
En Banc.

April 22, 1991.

John Suthers, Dist. Atty., Gordon R. Denison, Deputy Dist. Atty., Colorado Springs, for plaintiff-appellant.

Daniel & Thom, P.C., Bobby Lane Daniel, Norman R. Thom, Colorado Springs, for defendant-appellee.

Justice QUINN delivered the Opinion of the Court.

The People appeal from a ruling suppressing an inculpatory statement made by the defendant, Charles Earl Gennings, a Colorado Springs police officer, to a polygraph examiner following the administration of a polygraph examination, another statement made by him to a police department psychologist, and a third statement made by him to the district attorney's investigator. The court suppressed the defendant's post-polygraph statement as involuntarily made. The court suppressed the other two statements because, at the suppression hearing, the prosecution failed to establish the voluntary nature of the statements. We vacate the suppression ruling and remand the case for further proceedings.

I.

The defendant, who was a police officer of eleven years with the Colorado Springs Police Department, is charged with one count of aggravated incest for having sexual contact with his sixteen-year old stepdaughter between July 1, 1988, and August 4, 1989. The evidence at a preliminary

hearing established that an investigation was commenced after the defendant sought assistance from a police department psychologist for what was described as a problem he was having with his stepdaughter. The psychologist reported the matter to the Colorado Springs Police Department,[1] which in turn referred the matter to the El Paso County Department of Social Services. Additional evidence at the preliminary hearing established that on August 4, 1989, an investigator with the district attorney's office, along with the defendant's supervising sergeant and a social services investigator, went to the defendant's home and interviewed the defendant's stepdaughter. The stepdaughter confirmed to the investigators that the defendant had fondled her breasts on several occasions and had also touched her vagina. The prosecution also presented testimony showing that the defendant was interviewed at his home on this occasion and told the investigators that he once had pinched his stepdaughter on her breast while they were horseplaying, but he denied touching her in the vaginal area or receiving any sexual gratification from the conduct. Because the stepdaughter denied in her preliminary hearing testimony that the defendant had sexual contact with her, the prosecution presented testimony regarding her previous inconsistent statement made to the district attorney's investigator at her home. In addition, the prosecution established that the defendant had undergone a polygraph examination and had told the examiner during a post-examination interview that he had touched his stepdaughter's breasts to meet some sexual and emotional need on his part. The district court found probable cause on the charge of aggravated incest and bound the case over for trial.

Prior to trial, the defendant filed a motion to suppress his statements to the police psychologist, to the district attorney's investigator, and to the polygraph examiner on the ground that such statements were involuntarily made. The district court conducted a hearing on the motion over a two-day period. The evidence at the suppression hearing established that during the investigative phase of the case, before the filing of any charges, the defendant had retained an attorney to advise him. On August 8, 1989, Dennis Dean, a district attorney investigator, contacted the defendant's attorney and discussed a polygraph examination for the defendant. The defendant agreed to submit to a polygraph examination to be administered by Jeanne Overall, a civilian polygraph examiner employed by the Colorado Springs Police Department. Prior to the examination, which was scheduled for August 15, 1989, the district attorney investigator met with the examiner and briefed her on the investigation. The investigator told the polygraph examiner that the defendant had taken and passed another polygraph examination and that the purpose of the upcoming examination was to "nail down the issue of sexual gratification" with respect to the sexual contact.

The polygraph examiner was aware that the defendant was represented by counsel and made arrangements for the defendant and his attorney to be admitted to the police building on the evening of August 15, 1989, for the examination. The defendant arrived without his attorney and was directed to a small examining room in the stationhouse. The examiner initially asked the defendant if his attorney would be present. The defendant told her that he chose not to have his attorney present. The examiner then advised the defendant of his *Miranda* rights [2] and also told him that he could stop the polygraph examination at any time and that the police department had access to her records. When

---

**1.** Section 19–10–104, 8B C.R.S. (1986), states that when any person listed in the statute, including a mental health professional, has reasonable cause to know or suspect that a child has been subjected to abuse, that person "shall immediately report or cause a report to be made of such fact to the county department [of social services] or local law enforcement agen-

cy." The applicability of this statute to the defendant's consultation with the psychologist was not an issue either at the preliminary or the suppression hearings.

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

asked if he understood his rights, the defendant stated that he did.

The polygraph examiner first conducted a pre-test interview with the defendant to determine his testability and then administered the polygraph examination. After the examination was completed, the examiner conducted a post-examination interview which she described as part of standard polygraph procedure. She told the defendant that in her opinion he was deceptive on the examination and that he needed to be honest with her. The defendant told the examiner that his attorney had advised him that he was not to discuss the examination results with her. The examiner at that point, according to the defendant's suppression testimony, told the defendant that she was conducting the examination at the request of the district attorney's office, that the police department would have access to all her records and findings, and that "the police department will find out if you don't cooperate with me." The defendant testified that he became extremely nervous and upset at this remark and felt like a "caged animal." He stated that he wanted to leave but, feeling intimidated by the examiner's statement and manner and fearful of losing his job, he stayed in the room "because of what the police department was going to do and what the police department was going to say."

The polygraph examiner testified to a different version of these events. She testified that immediately following the examination she told the defendant that he had been deceptive on the test and that he was free to leave. The defendant, however, made no effort to leave. The examiner acknowledged during her testimony that although she was aware that the defendant's attorney had advised him not to discuss the test results, she employed a "soft technique" on the defendant during the post-examination interview. This technique, as described by the examiner, was to convey a sympathetic attitude and to tell the defendant that he would feel better if he talked to her about what actually occurred between him and his stepdaughter. The purpose of this technique, according to the examiner, was to persuade the defendant "to tell the truth." The examiner, however, denied that she told the defendant that the police department would be informed of his refusal to cooperate with her. She testified that she would not make such a statement because, in her view, "it sounds like a threat." The defendant remained for the post-examination interview and, according to the examiner, acknowledged during the interview that he had touched his stepdaughter's breasts to meet a "sexual and emotional need."

At the conclusion of the evidence relating to the polygraph examination, the prosecuting attorney requested permission to present evidence concerning the defendant's statements to the police psychologist and to the district attorney's investigator. The district court denied the request and proceeded to rule on the motion to suppress. Finding that the polygraph examiner had violated the Code of Professional Responsibility by interviewing the defendant after the polygraph examination in the absence of and without notification to the defendant's attorney and by conducting the post-examination interview in a psychologically coercive manner, the court concluded that the defendant's post-examination statement to the examiner was involuntarily made and suppressed that statement. The court also suppressed the defendant's statements to the police psychologist and to the district attorney's investigator because the prosecution had failed to present any evidence establishing the voluntary nature of those statements.

The People thereafter filed this interlocutory appeal. After the record and briefs were filed, we remanded the case to the district court for more specific findings on the factual basis for suppressing the defendant's post-examination statement to the polygraph examiner. In a supplemental ruling after remand, the district court did not address whether the polygraph examiner had violated the Code of Professional Responsibility and instead ruled that "any reasonable person in the defendant's circumstances would not have felt free to leave the post-test interview" and that the defendant accordingly "had been subjected

to custodial interrogation by Ms. Overall during the post-test interview." The court also expressly determined that the polygraph examiner, although aware that the defendant had been advised by his attorney to refrain from discussing the test results, confronted the defendant with the accusation that he was guilty and that his job was at risk and then employed a "soft technique" to get him to talk. The court concluded that the examiner's conduct constituted "coercive police activity" that rendered the defendant's post-examination statement constitutionally involuntary. The pertinent part of the court's supplemental ruling on this aspect of the suppression motion was as follows:

> Despite being advised that Officer Genning[s'] attorney had instructed him to leave, Ms. Overall went ahead with the post-test interview. She obtained Officer Gennings['] acquiescence by implying that his job was at risk. She confronted him with accusations that he was being deceptive; that he was guilty. She knew that individuals were often vulnerable at such times. She knew that Officer Gennings was upset, even crying at times. She used his need to cooperate to preserve his job to get him to answer her questions. She was alone with him for over four hours in a small, confined room.
>
> A criminal defendant's extrajudicial statement can only be admitted if it was voluntary. A statement is not voluntary if extracted by any sort of threats or violence or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence. Under the totality of the circumstances, the Court concludes that the prosecution did not establish by a preponderance of the evidence that the statements made by Officer Gennings during the post-test interview were voluntary.

In its supplemental ruling, the court expressly addressed the conflict in testimony between the defendant and the polygraph examiner and found the defendant's testimony to be more credible. In the court's view, "[h]is testimony was more consistent with the motivations of the parties to the interview, it made more sense, and finally Ms. Overall seemed to attempt to mislead the Court regarding Mr. Dean's conversations with her about the purpose of the polygraph." [3]

The People argue on this appeal that the suppression testimony does not support the district court's ruling that the defendant's post-examination statement to the polygraph examiner was constitutionally involuntary and that the district court also improperly suppressed the defendant's two other statements without affording the prosecution any opportunity to prove the voluntary nature of those statements. We will first address that part of the district court's ruling which concluded that the defendant's post-examination statement to the polygraph examiner was involuntary and then will consider the court's suppression of the two other statements.

## II.

When a defendant challenges a confession or inculpatory statement, the prosecution must establish by a preponderance of the evidence that the confession or statement was voluntarily made. *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 626–27, 30 L.Ed.2d 618 (1972); *accord, People v. Branch*, 805 P.2d 1075, 1080 (Colo. 1991); *Deeds v. People*, 747 P.2d 1266, 1272 (Colo.1987). A confession or inculpatory statement is involuntary if coercive governmental conduct played a significant role in inducing the statement. *Colorado v. Connelly*, 479 U.S. 157, 163–67, 107 S.Ct. 515, 519–22, 93 L.Ed.2d 473 (Colo.1986). Coercive police conduct includes not only physi-

---

**3.** Mr. Dean was the district attorney's investigator who arranged the polygraph examination. At the suppression hearing, the polygraph examiner initially testified that the purpose of the examination was simply to determine whether the defendant was telling the truth, and denied that the purpose was to resolve the issue of sexual gratification incident to any touching that might have occurred. On cross-examination by defense counsel, however, the examiner admitted that she had previously testified at the preliminary hearing that "the purpose was to nail down the issue of sexual gratification."

cal abuse or threats directed against a person but also subtle forms of psychological coercion. *Arizona v. Fulminante,* ——— U.S. ———, ———, 111 S.Ct. 1246, 1252–54, 113 L.Ed.2d 302 (1991); *Branch,* 805 P.2d at 1080. While a defendant's mental condition, by itself and apart from its relationship to official coercion, does not resolve the issue of constitutional voluntariness, *Connelly,* 479 U.S. at 164, 107 S.Ct. at 520, the deliberate exploitation of a person's weakness by psychological intimidation can under some circumstances constitute a form of governmental coercion that renders a statement involuntary.

The voluntariness of a confession or inculpatory statement must be determined by a consideration of the totality of circumstances under which the statement was made. *Mincey v. Arizona,* 437 U.S. 385, 401, 98 S.Ct. 2408, 2418, 57 L.Ed.2d 290 (1978); *People v. Smith,* 716 P.2d 1115, 1119 (Colo.1986); *People v. Raffaelli,* 647 P.2d 230, 235 (Colo.1982). The term "totality of circumstances" refers to the significant details surrounding and inhering in the interrogation under consideration. Included in any listing of such details, but by no means intended as an exhaustive cataloging, are the following: whether the defendant was in custody or was free to leave and was aware of his situation; whether *Miranda* warnings were given prior to any interrogation and whether the defendant understood and waived his *Miranda* rights; whether the defendant had the opportunity to confer with counsel or anyone else prior to the interrogation; whether the challenged statement was made during the course of an interrogation or instead was volunteered; whether any overt or implied threat or promise was directed to the defendant; the method and style employed by

the interrogator in questioning the defendant and the length and place of the interrogation; and the defendant's mental and physical condition immediately prior to and during the interrogation, as well as his educational background, employment status, and prior experience with law enforcement and the criminal justice system.

■■■ In ruling on a motion to suppress a confession or inculpatory statement, a court must engage in both factfinding and law application. *People v. Quezada,* 731 P.2d 730, 732 (Colo.1987). While a trial court's findings of historical fact are entitled to deference and will not be overturned if adequately supported by competent evidence in the record, *e.g., People v. Trujillo,* 784 P.2d 788, 792 (Colo.1990), it is critical that the trial court, in making its findings, expressly resolve on the record the contested factual issues. *People v. Martinez,* 789 P.2d 420, 423 (Colo.1990). A trial court also is obliged to apply the correct legal standard to its factual findings in resolving a suppression motion. Just as a trial court's application of an erroneous legal standard in resolving a suppression motion is subject to correction on appeal, so also is an ultimate legal conclusion of constitutional law that is inconsistent with or unsupported by evidentiary findings. *Quezada,* 731 P.2d at 732–33.

■■■ In its supplemental ruling, the district court relied on the following two factors in concluding that the defendant's post-examination statement to the polygraph examiner was involuntary: the defendant was in custody at the time the statement was made; and the polygraph examiner used psychologically coercive tactics in the post-examination interview.[4] We

---

**4.** In its initial ruling, the district court emphasized that the polygraph examiner, after having been made aware that the defendant had been told by his attorney *not to discuss the test results,* violated the Code of Professional Responsibility by conducting the post-examination interview in the absence of and without notification to the defendant's attorney. In its supplemental ruling after remand of the case, however, the district court made no mention of the Code of Professional Responsibility. We thus assume that the district court's reference to the

Code of Professional Responsibility in its initial suppression ruling played no part in its final suppression ruling. On the basis of that assumption, *our review of the suppression ruling* is confined to the two factors relied on in the district court's final ruling—*i.e.,* the custodial nature of the interrogation and the psychologically coercive tactics of the polygraph examiner.

We believe it appropriate to mention here that the polygraph examiner was not an attorney, and, hence, the Code of Professional Responsibility was not directly applicable to her. The

will examine these two factors in turn on the basis of the evidence presented at the suppression hearing.

### A.

■ In its initial ruling the district court did not consider whether the defendant had been subjected to custodial interrogation during his post-examination interview with the polygraph examiner, but on remand the court determined that "any reasonable person in the defendant's circumstances would not have felt free to leave the post-test interview." The district court misapplied the "reasonable person" test in resolving the issue of custodial interrogation.

The test for custodial interrogation is an objective one—that is, whether a reasonable person in the defendant's position would have considered himself deprived of his freedom of action in a significant manner during a police interrogation in which the defendant was exposed to the risk of self-incrimination. *E.g., People v. Probasco,* 795 P.2d 1330, 1332 (Colo.1990); *People v. Trujillo,* 785 P.2d 1290, 1293 (Colo.1990); *People v. Cleburn,* 782 P.2d 784, 786 (Colo. 1989). "The 'reasonable-person' standard is a controlling test because, unlike a subjective test, it 'is not solely dependent either on the self-serving declarations of the police officers or the defendant nor does it place upon the police the burden of anticipating the frailties or idiosyncracies of every person whom they question.'" *People v. Trujillo,* 785 P.2d 1290, 1293 (Colo.1990)

(quoting *Berkemer v. McCarty,* 468 U.S. 420, 442 n. 35, 104 S.Ct. 3138, 3151 n. 35, 82 L.Ed.2d 317 (1984)).

■ In applying the "reasonable person" test in its suppression ruling, the district court focused on the defendant's subjective apprehension about his job status with the police department and disregarded other uncontradicted evidence concerning the circumstances surrounding the post-examination interview. The evidence was undisputed that the defendant, an experienced police officer, voluntarily participated in the polygraph examination after consulting with his attorney. There was also uncontradicted evidence that the defendant was fully aware that he was at the police station only for the limited purpose of the examination, that the polygraph examiner was a civilian employee of the police department and was not empowered to detain him against his will during or after the examination, and that he could have left the examining room and the police station at any time. Although the defendant testified that his concern for his job status with the police department prompted him to remain for the post-examination interview, neither that testimony nor any other testimony supports the conclusion that a reasonable person in the defendant's position would have considered himself in police custody or somehow deprived him of his freedom to leave the room at any time before or during his post-examination interview with the polygraph examiner.

polygraph examiner, nonetheless, was acting at the request of and as an agent of the district attorney's office in administering the polygraph examination to the defendant. The district attorney, as her principal, could be responsible for any misconduct on her part if the district attorney ordered or ratified the misconduct. *See American Bar Association Model Rules of Professional Conduct,* Rule 5.3(c) (1984) (lawyer responsible for conduct of nonlawyer employed or retained by or associated with lawyer when such conduct would be violative of rules of professional conduct if engaged in by lawyer and lawyer orders or, with knowledge of conduct, ratifies the nonlawyer's conduct). The record in this case, however, is barren of any evidence establishing that the district attorney authorized the examiner to participate in some form of conversation or interview with the defendant that might arguably violate the rules of

professional conduct if a lawyer engaged in those same communications. What the record shows is that the district attorney's office arranged the polygraph examination with the consent and approval of the defendant and his attorney and, other than briefing the examiner on the investigation and emphasizing that the purpose of the examination was to resolve the issue of sexual gratification, left the details of the examination to the polygraph examiner. While the issue of the examiner's alleged ethical violation was hotly contested at the suppression hearing, the evidence does not show that the district attorney was aware of and ratified any improper conduct by the examiner. The fact that the district court in its initial suppression ruling rejected the examiner's version of the post-examination interview provided no warrant for imputing professional misconduct to the district attorney during the interview.

## B.

The second factor upon which the district court relied in its suppression ruling was the polygraph examiner's use of psychologically coercive tactics in inducing the defendant to engage in the post-examination interview. This aspect of the district court's ruling finds some support in the record, but a remand of the case for a new hearing is nonetheless necessary.

■ What is critical to any finding of involuntariness is the existence of coercive governmental conduct, physical or mental, that plays a significant role in inducing a confession or inculpatory statement. *Fulminante*, —— U.S. at ——, 111 S.Ct. at 1252–54, 113 L.Ed.2d 302; *Connelly*, 479 U.S. at 163–67, 107 S.Ct. at 519–22. The determination of whether the governmental conduct is actually coercive and induces a challenged statement, of course, can only be made by assessing the totality of circumstances under which the statement was made. As previously noted, we are satisfied that, under the objective "reasonable person" test, the defendant was not in custody during the post-examination interview with the polygraph examiner. Custody, however, is only one factor to consider and is not indispensable to a finding of voluntariness. *See People v. McIntyre*, 789 P.2d 1108, 1110 (Colo.1991) (admission of a defendant's involuntary confession offends due process, whether or not the defendant was in custody when the confession was made); *People v. Parada*, 188 Colo. 230, 533 P.2d 1121 (1975) (defendant's statement made to district attorney investigators at social services office not custodial but nonetheless determined to be constitutionally involuntary as result of implied promise); *People v. Rex*, 636 P.2d 1282 (Colo. App.1981) (noncustodial statement of defendant made to police officer at hospital determined to be constitutionally involuntary as product of police officer's taking advantage of defendant's confused mental state).

■ The record shows that the defendant was given *Miranda* warnings at the outset of the examination, was an experienced police officer, and was fully aware of his right to leave the examination and post-examination interview at any time. These factors certainly weigh on the side of voluntariness. However, there also was evidence that the defendant was quite apprehensive about the possibility of criminal charges being filed against him and his future as a police officer. In addition, significant evidence bearing on the issue of voluntariness consisted of the testimony describing the method and style utilized by the polygraph examiner during the post-examination interview. The polygraph examiner admitted that she informed the defendant that he had been deceptive on the examination and then initially used a "soft technique" by conveying a supportive attitude toward his predicament and telling him that he would feel better if he talked to her about the problem. The so-called "soft technique," the examiner acknowledged, was utilized in order to obtain a truthful admission from the defendant. According to the defendant's suppression testimony, when he told the examiner that his attorney had advised him not to discuss the results of the examination, the examiner became threatening and told him that the police department would know of his refusal to cooperate with her. Although the polygraph examiner denied making this latter statement, which she viewed as a form of threat, the district court expressly found the defendant's testimony to be credible and rejected the examiner's version of the events.

It was the prerogative of the district court, as the finder of fact, to assess the credibility of the defendant and the polygraph examiner and to weigh their respective versions of the post-examination interview. *E.g., Parada*, 188 Colo. at 234, 533 P.2d at 1123. While we are satisfied that there was evidence sufficient to support the court's finding that the polygraph examiner's manner and style of engaging the defendant in a post-examination interview were psychologically coercive, we cannot say with any assurance that the polygraph examiner's conduct played so significant a role in overbearing the defendant's will as to have caused the defendant's statement

to be constitutionally involuntary. This latter determination, as previously discussed, must be resolved by assessing the total circumstances, of which the polygraph examiner's conduct is only one part, albeit a very important one, in the calculus.

Our uncertainty on the ultimate issue of voluntariness is due primarily to the fact that the district court in its final suppression ruling placed significant weight on the fact that the defendant was in custody when his inculpatory statement was made to the polygraph examiner and, other than characterizing the polygraph examiner's tactics as psychologically coercive, made no mention of any other factors bearing on the issue of voluntariness. In light of our determination that the court's ruling on custody was not adequately supported in the record, and because the issue of voluntariness must be determined under the totality of circumstances, *e.g., Mincey,* 437 U.S. at 401, 98 S.Ct. at 2418, we believe the proper disposition of this case is to remand the matter to the district court for a new evidentiary hearing on the issue of voluntariness.

### III.

■ We turn now to that part of the district court's ruling which suppressed the defendant's interview with the police psychologist that precipitated the ensuing investigation and his statement to the investigator at his home on August 4, 1989. The court suppressed these statements because, in its view, the prosecution failed to carry its burden of proof on voluntariness. Although some testimony regarding these statements was admitted at the preliminary hearing, the court at the suppression hearing terminated the hearing after both sides had presented testimony with respect to the defendant's post-examination statement to the polygraph examiner. At that point the district attorney requested permission to present evidence concerning the defendant's other statements to the police psychologist and to the district attorney's investigator, but the court denied the request and proceeded to rule on the motion to suppress. The court erred in terminating the suppression hearing in this fashion.

The prosecution bears the burden of establishing the voluntariness of a confession or inculpatory statement by a preponderance of the evidence, *Lego,* 404 U.S. at 489, 92 S.Ct. at 626–27, and must be afforded a reasonable opportunity to meet that burden. The district court's denial of the prosecution's request to present testimony on the defendant's other two statements deprived the prosecution of any reasonable opportunity to meet its burden of proof on the voluntariness of those statements. Under these circumstances, we believe it appropriate to vacate the district court's suppression of the defendant's statement to the police psychologist and his statement to the district attorney investigator and to remand the case for a new evidentiary hearing on the voluntariness of those statements, along with the voluntariness of the defendant's post-examination statement to the polygraph examiner.

The suppression ruling is accordingly vacated, and the case is remanded to the district court with directions to conduct a new evidentiary hearing in a manner not inconsistent with the views herein expressed.