**Phillip EFFLAND, Petitioner**

v.

**The PEOPLE of the State of Colorado, Respondent.**

No. 09SC70.

Supreme Court of Colorado,
En Banc.

Sept. 27, 2010.

Rehearing Denied Nov. 8, 2010.*

* Justice Rice, Justice Coats, and Justice Eid would grant the Petition.

Douglas K. Wilson, Public Defender, Katherine Brien, Special Deputy Public Defender, Denver, Colorado, Attorneys for Petitioner.

John W. Suthers, Attorney General, Rebecca A. Adams, Assistant Attorney General, Denver, Colorado, Attorneys for Respondent.

Justice MARTINEZ delivered the Opinion of the Court.

## I. Introduction

This case involves a failed suicide pact between Petitioner Phillip Effland, his wife, and adult daughter. Petitioner's wife and daughter did not survive the incident; however, Petitioner did. Following his suicide attempt and the deaths of his wife and daughter, Petitioner was interrogated inside his hospital room by two police officers without the benefit of *Miranda* warnings. During the interrogation, Petitioner repeatedly stated that he did not wish to speak with the investigators until he had consulted with an attorney. The trial court denied Petitioner's motion to suppress the statements he made during the interrogation. First, the trial court held that Petitioner was not in custody at the time of the interrogation and therefore was not entitled to *Miranda* protections. Second, because the court determined that Petitioner was not in custody, the court ruled that his invocations of the rights to remain silent and to counsel did not need to be honored. Third, the court held that Petitioner made the statements voluntarily. Finally, the trial court held that prosecutorial misconduct did not require suppression of the statements. The court of appeals affirmed.

We hold that Petitioner was in custody for *Miranda* purposes at the time of the interrogation and his statements should therefore have been suppressed during the prosecution's case-in-chief. Having determined that Petitioner was in custody for *Miranda* pur-

poses at the time of the interrogation, we do not reach the issue of whether, and to what degree, invocations of the rights to remain silent and to counsel must be honored in non-custodial interrogations. We also hold that Petitioner's statements were not made voluntarily and must also be suppressed under the due process clauses of the United States and Colorado Constitutions. Finally, we hold that prosecutorial misconduct, if any, does not require suppression of Petitioner's statements.

## II. Facts and Procedural History

After receiving a request for a welfare check from Petitioner's adult daughter, Marna Arnett, police officers entered Petitioner's home. When the officers arrived, they found a suicide note attached to the back door. Upon entering the home, the officers found Petitioner's wife, Denise Effland, and second adult daughter, Brenna Effland, dead in the living room of the home. Denise Effland died of an apparent gunshot wound to the head, while Brenna appeared to have died from a drug overdose.[1] In another room of the home, the officers discovered Petitioner lying on the floor, shaking and incoherent. The officers also discovered a second suicide note inside the house, signed by all three family members. Petitioner was handcuffed and removed from the home. Several minutes later, an ambulance arrived to transport Petitioner to a hospital to receive medical attention. Once inside the ambulance the handcuffs were removed; an investigating officer accompanied Petitioner to the hospital inside the ambulance.

The following day, two police officers, Officer Sheets and Officer Hodgkin, arrived at the hospital to question Petitioner. Officers Sheets and Hodgkin were dressed in plain clothes. At the time, Petitioner was in the intensive care unit and hospital staff told the officers that Petitioner's doctor recommended they try to speak with Petitioner at a later time. The investigating officers left, but a uniformed officer remained stationed outside of Petitioner's room. The trial testimony is somewhat unclear as to the directions the uniformed officer received re-

garding his duties. The officer first testified that he was instructed not to allow Petitioner to leave the hospital, but later stated that, if Petitioner was able to do so, which he was not, he would have been free to leave. The officer testified that he sat in a chair outside of Petitioner's room near the nurse's station. Petitioner's room had a glass wall with an open curtain hanging inside. The officer testified that the door to Petitioner's room was open to the hallway throughout almost all of the time he was stationed outside of the room. The officer stated that he was able to see inside Petitioner's room and observe Petitioner the entire time he was stationed in the hallway. The officer additionally testified that Petitioner would have been able to see him sitting outside the room and, to the best of his recollection, Petitioner did in fact observe him.

At some point the same day, Officers Sheets and Hodgkin met with Marna Arnett who informed them she was attempting to obtain a lawyer for her father. Later the same day, the officers returned to the hospital to interview Petitioner, again dressed in plain clothes. The officers entered Petitioner's room and explained they were there investigating the events of the previous day and that they wished to speak with Petitioner about what had occurred. Officer Sheets stated that Petitioner was "coherent enough to realize that he was alive and his family was not." Petitioner responded that he was not ready to talk about the situation, but that he might be willing to do so in the future. The officers then asked if Petitioner would execute a medical release, which he declined to sign.

Officers Sheets and Hodgkin returned the next day, dressed in civilian clothes. They had previously spoken to a Deputy District Attorney from the Arapahoe County District Attorney's Office about whether it would be proper to speak with Petitioner without an attorney present. The Deputy District Attorney informed the officers that, because Petitioner was not in legal custody and had not been charged with a crime, he was not entitled to an attorney. Prior to entering

1. A number of empty prescription medication bottles were found in the living room.

Petitioner's room, the officers spoke with Marna Arnett, who stated that her father would probably not wish to speak with them. The officers responded "that would be his decision" and that they would nonetheless "talk to him." Marna then asked if she could be present during the questioning, but the officers responded that they wished to speak with Petitioner alone.

The officers then entered Petitioner's room, shutting the door behind them and taking seats in the visitors' chairs. The uniformed officer remained outside of the hospital room. The chairs in which the officers were seated were located very close to Petitioner's bed, within an arm's reach of Petitioner, and stood between the bed and the room's only exit. One officer sat close to Petitioner's head, while the other sat near his feet. The officers stated that they wished to speak with Petitioner and asked if he was willing. Petitioner answered that he would prefer to speak to an attorney first. Officer Sheets then told Petitioner that it was important for the officers to hear his version of the story in order to accurately understand what had occurred. Petitioner again stated that his daughter and sister were attempting to find him an attorney. The officers then asked if Petitioner would be willing to speak with them concerning the disposition of the personal property located at his home, as, when the officers had arrived two days earlier, an eviction notice was affixed to the front door. Petitioner stated that Marna was likely going to take care of his property. The officers then asked about Petitioner's medical status and whether he was likely to be released soon. Petitioner responded that he thought he would be released that day or the next, but that a mental health evaluation would have to be performed first. At that point, Officer Sheets told Petitioner that, because he was not under arrest, not in legal custody, and had not been charged with a crime, he was not entitled to an attorney.

The officers then told Petitioner they had been to his home to "collect evidence" and had formed a theory as to what had occurred. Officer Sheets told Petitioner that he was not going to ask him any questions, but was just going to tell him what the evidence suggested. Officer Sheets then told Petitioner he believed the following, among other things: (1) the Efflands were having financial hardships; (2) they were being evicted; (3) they all decided to commit suicide; (4) Petitioner wrote the suicide note attached to the back door; (5) Denise Effland wrote the suicide note located in the living room that contained the signatures of all three family members; (6) Petitioner's daughter Brenna died from a drug overdose; (7) Denise Effland died from a gunshot wound to her head; (8) that Petitioner was the one who shot Denise Effland; and (9) Petitioner took additional medications in an attempt to kill himself after shooting his wife.

Officer Sheets testified that while he was explaining his theory to Petitioner, Petitioner was crying and emotional and verbally agreed to some of the actions the officer described. At the end of Officer Sheets' explanation of his theory, he told Petitioner that "the only way to know for certain" what had occurred was to hear his side of the story, and asked "would you now want to talk to me about what happened?" Petitioner responded "all of your surmises are correct. If you give me a day or two I will walk you through it." Petitioner then again indicated that he did not wish to speak further until he spoke with an attorney. However, the officers continued to ask Petitioner questions and eventually Petitioner began answering them. Petitioner stated, among other things, that he, his wife, and daughter divided his medication (which he identified), and the three of them simultaneously ingested the medications. After being asked about the gun, Petitioner stated: (1) his wife asked him to ensure that she died and he promised her he would; (2) he went to the garage and retrieved the gun, but concealed it from his wife and daughter so as not to alarm them; (3) he woke up at some point and realized he was not dead; (4) he saw Denise's chest rise and fall; (5) he thought about waking her to take more medication but remembered his promise and thought she might be mad if he failed to keep it; (6) he indicated he shot Denise but could not recall the details of the shooting; and (7) he then consumed lithium which he thought was the most lethal medication he possessed.

After again indicating that he did not wish to discuss anything further, the officers left. The encounter between the police and Petitioner lasted for approximately one hour. Officer Sheets testified that they spoke in a normal tone throughout the interrogation. The officers never advised Petitioner of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

After returning to the station following the questioning, the officers conferred with their supervisor and a representative from the District Attorney's office, who determined that Petitioner would be charged. Officers Sheets and Hodgkin then returned to the hospital, where they informed Petitioner he was under arrest and advised him of his rights pursuant to *Miranda*. The officers then again gave Petitioner a medical waiver form, which he again stated he did not wish to sign and refused to answer any further questions without first speaking to an attorney.

Subsequently, Petitioner was charged with first degree murder in the death of Denise Effland, manslaughter—aiding suicide in the death of Denise Effland and Brenna Effland, and a crime of violence. Prior to trial, Petitioner filed two motions to suppress the statements he made to the officers while in the hospital, arguing suppression was warranted because (1) the statements were made during custodial interrogation without the benefit of *Miranda* warnings; (2) Petitioner had affirmatively invoked his Fifth Amendment rights to counsel and to remain silent and the officers did not honor his invocation; (3) his statements were not voluntary under the Fourth Amendment; and (4) suppression was required because of prosecutorial misconduct in informing the officers that Petitioner was not entitled to an attorney.

The trial court denied the motions to suppress, finding that Petitioner was not in custody and therefore not entitled to *Miranda* warnings or the presence of an attorney. As to the Fourth Amendment voluntariness argument, the trial court concluded that the statements were not made as a result of coercion or intimidation. Finally, the court determined that prosecutorial misconduct, if any, did not require suppression. The court of appeals agreed, affirming the trial court. We granted certiorari [2] and now reverse in part and affirm in part.

### III. Analysis

#### A. *Miranda*

To protect a suspect's Fifth Amendment right against self-incrimination, *Miranda* prohibits the prosecution from introducing in its case-in-chief any statement, whether inculpatory or exculpatory, procured by custodial interrogation, unless the police precede their interrogation with certain warnings. 384 U.S. at 444, 86 S.Ct. 1602. Accordingly, *Miranda* protections only apply when a suspect is subject to both custody and interrogation. Here, the parties do not dispute that Petitioner was interrogated at the hospital. Rather, the controversy centers on the custody determination.

Whether an individual is in custody for *Miranda* purposes is a question of law that we review de novo.[3] *People v. Matheny,*

2. We granted certiorari on the following issues:

1. Whether the court of appeals erroneously confirmed the district court's denial of Petitioner's motion to suppress his statements because the interrogating officers did not advise him of his *Miranda* rights or obtain a valid waiver of those rights.
2. Whether the court of appeals erroneously confirmed the district court's denial of Petitioner's motion to suppress his statements after Petitioner proactively invoked is Fifth Amendment rights to silence and to counsel and the investigating officers told Petitioner he was not entitled to legal representation because he was not in custody.

3. Whether the court of appeals erred in finding the Petitioner's statements voluntary under the totality of the circumstances.
4. Whether the court of appeals erred in not finding prosecutorial misconduct when the prosecuting attorney advised the interrogating officers that Petitioner was not entitled to counsel, which the officers then told Petitioner when he asserted his right[s] to remain silent and to counsel.

3. We note that in addressing the appropriate standard of review to apply to a trial court's custody determination, the court of appeals stated: "A trial court's findings of fact on whether a defendant was not in custody will not be reversed on appeal if they are supported by competent

46 P.3d 453, 462 (Colo.2002). In determining whether an individual has been subjected to custodial interrogation, the relevant inquiry is "whether a reasonable person in the suspect's position would believe himself to be deprived of his freedom of action to the degree associated with a formal arrest." *People v. Hankins*, 201 P.3d 1215, 1218 (Colo.2009) (quoting *Matheny*, 46 P.3d at 467); *see also Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) ("ultimate inquiry" for *Miranda* custody determination is whether "there was a formal arrest or restraint on freedom of movement of the degree associated with formal arrest" (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983))). To make this determination, "[t]wo discrete inquiries are essential ... first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Keohane*, 516 U.S. at 112, 116 S.Ct. 457.

■ The custody inquiry analyzes the totality of the circumstances, including:

(1) the time, place, and purpose of the encounter; (2) the persons present during the interrogation; (3) the words spoken by the officer to the defendant; (4) the officer's tone of voice and general demeanor;

(5) the length and mood of the interrogation; (6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; (7) the officer's response to any questions asked by the defendant; (8) whether directions were given to the defendant during the interrogation; and (9) the defendant's verbal or nonverbal response to such directions.

*Matheny*, 46 P.3d at 465–66. No one factor is determinative. *Id.* at 466–67.

■ Here, the trial court found that under the totality of the circumstances, Petitioner was not in custody and the court of appeals affirmed. In reaching this conclusion, both courts relied on the facts that, while Petitioner was at least partially immobilized in a hospital bed, this was for medical reasons, that the deputy stationed outside Petitioner's door had been instructed not to detain Petitioner,[4] that the interrogation occurred in a conversational tone, and that the officers told Petitioner he was not under arrest at that time.

Petitioner argues that under the totality of the circumstances, no reasonable person in his situation would have felt free to terminate the interrogation. Particularly, Petitioner points to the fact that a uniformed police officer was posted outside his hospital room, that he was attached to an intravenous line at

evidence and the correct legal standard, which addresses the totality of the circumstances, is applied." In making this statement, the court of appeals relied on a 1991 case, *People v. Miller*, 829 P.2d 443, 445 (Colo.App.1991), which in turn relied on *People v. Trujillo*, 784 P.2d 788 (Colo.1990), for the proposition quoted by the court of appeals below. The standard in *Trujillo* was abrogated by this court in *Matheny*. *See* 46 P.3d at 459–62. Accordingly, to the extent that the court of appeals' discussion of the standard of review suggests a standard of review other than de novo, this statement is legally incorrect. *See Matheny*, 46 P.3d at 458–62 (stating that correct standard is de novo and specifically rejecting argument that trial court's custody determination must be upheld if "the trial court's findings of historical fact are adequately supported by competent evidence and ... the court applied the correct legal standard to these findings in resolving the issue before it").

4. This finding does not appear to be altogether supported by the record as the officer testified

both that he had been instructed not to allow Petitioner to leave the hospital and that Petitioner was free to leave the hospital, and he was merely stationed outside Petitioner's room for the purpose of alerting Officer Sheets should Petitioner leave the hospital. However, regardless of what the officer's instructions in fact were, they are immaterial to the present inquiry because "a police officer's 'unarticulated plan' has no bearing on whether an individual is in custody for *Miranda* purposes unless that plan would somehow affect the way a reasonable person would perceive his situation." *People v. Minjarez*, 81 P.3d 348, 355 (Colo.2003); *see also Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) ("Our decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."); *People v. Elmarr*, 181 P.3d 1157, 1162 (Colo.2008) (trial court erred in considering police officer's testimony that he considered defendant to be in custody).

the time of the interrogation, repeatedly stated that he did not wish to be questioned at that time, and that Officer Sheets denied his request for an attorney as evidence that a reasonable person would not feel free to terminate the interrogation.

While we have never reviewed a scenario precisely like the one at issue in this case, our prior custody cases are illustrative. In *People v. Minjarez*, 81 P.3d 348, 350 (Colo. 2003), the defendant was questioned in a private conference room at a hospital where the defendant's daughter was receiving treatment. In determining that the defendant was in custody for *Miranda* purposes at the time of the interrogation, this court looked to the facts that the interrogation occurred in a small room, that the door was closed, that the officers, "intentionally or not, physically separated defendant from the door," that the defendant was emotionally distraught, that the interrogation proceeded in a "highly confrontational and accusatory atmosphere that was clearly aimed at obtaining a confession," that "[t]he interrogating officer's questions provided all of the details of the incident and were designed essentially to force agreement from the defendant", and that "the interrogating officer confronted the defendant with the evidence against him and with his own belief in the defendant's guilt." *Id.* at 356. In concluding that defendant was in custody, this court stated that the fact the interrogating officers informed the defendant that he was free to leave, when "all external circumstances appear[ed] to the contrary," did not render the interrogation non-custodial. *Id.* at 357.

Conversely, in *Matheny*, this court held that the defendant was not in custody because, although the questioning took place in a secured area of a police station, the defendant drove himself to the police station voluntarily, was relaxed throughout the interview, was accompanied by his mother, and told his story in narrative form with little prompting or questioning. 46 P.3d at 467.

We find the custody determination in the present case to be a close one. The facts that weigh against a finding of custody are as follows: (1) Petitioner was informed that he was not in police custody and had not been charged with a crime; (2) the investigating officers were dressed in civilian clothes; (3) Petitioner was not handcuffed or restrained by law enforcement; (4) Petitioner's mobility was limited for medical reasons unrelated to police conduct; and (5) the interrogation was conducted in a conversational tone.

Conversely, the facts that weigh in favor of finding that Petitioner was in custody are as follows: (1) Petitioner was handcuffed when he was removed from his home; (2) Petitioner was accompanied to the hospital by a police officer; (3) a uniformed police officer was stationed outside of Petitioner's hospital room and the evidence presented at trial supports a conclusion that Petitioner knew of the officer's presence; (4) Petitioner repeatedly informed the investigating officers that he did not wish to speak with them; (5) Petitioner repeatedly stated that he wished to consult with an attorney prior to speaking with the investigating officers; (6) the investigating officers continued to ask questions after Petitioner informed them him he did not wish to speak with them; (7) the investigating officers informed Petitioner that he was not entitled to an attorney; (8) the investigating officers closed the door during the interrogation; (9) the investigating· officers sat in very close proximity to Petitioner, one near his head and the other near his feet; (10) the police officers sat between Petitioner and the closed door; (11) Petitioner was emotionally distraught and was crying throughout the interrogation; (12) there were two police officers present, while Petitioner's daughter had been excluded from the interrogation; (13) the purpose of the interrogation was to elicit information from Petitioner related to the deaths of Denise and Brenna Effland for use in a criminal investigation into Petitioner's role in the deaths; (14) the interrogation consisted of questioning and short answers from Petitioner and did not proceed in narrative form; and (15) while Petitioner was confined to the hospital for medical reasons, Petitioner was unable to leave the premises and was connected to an intravenous line.

After reviewing the totality of the circumstances, we find that a reasonable person in Petitioner's circumstances would consider

himself to be deprived of his freedom of action to a degree associated with formal arrest and would not consider himself free to terminate the communication and leave. *Keohane*, 516 U.S. at 112, 116 S.Ct. 457. Although factually distinguishable, we find *Minjarez* to be instructive in reaching this conclusion. As in *Minjarez*, here, Petitioner was questioned in a small room with the door closed. Although it may not have been the intent of the officers to separate Petitioner from the door, Officers Sheets and Hodgkin placed themselves between Petitioner and the room's only exit. *Minjarez*, 81 P.3d at 356 (the investigating officers, "intentionally or not, physically separated defendant from the door"). Petitioner was emotionally distraught and visibly crying. *Id.* at 356 (defendant was "visibly emotionally distraught" both at the outset and throughout the interview); *cf. Matheny*, 46 P.3d at 467 (defendant relaxed throughout interrogation). The interrogating officer's questions provided all of the details of the incident and were designed to elicit agreement from Petitioner. *Minjarez*, 81 P.3d at 356; *cf. Matheny*, 46 P.3d at 467 (defendant made statements in narrative form). The interrogating officer confronted Petitioner with the evidence against him, including a belief that Petitioner shot his wife. *Minjarez*, 81 P.3d at 356 (interrogating officer confronted defendant with the evidence against him).

In addition to the facts similar to those presented in *Minjarez*, of particular significance in this case is the fact that Petitioner's expressed desire not to speak with the investigating officers until after he had spoken with an attorney went unheeded. At two different times during the interrogation, Petitioner attempted to terminate the encounter. However, Officers Sheets and Hodgkin disregarded these requests and proceeded with questioning. While it has been established that Petitioner could likely not leave the area of the interrogation for medical reasons unrelated to police conduct, Petitioner attempted to do what he could to terminate the communication. However, his attempts were disregarded. This fact would lead a reasonable person in Petitioner's position to feel that he is not free to terminate the communication. *Keohane*, 516 U.S. at

112, 116 S.Ct. 457 (custody inquiry is whether "a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave").

The present case is distinct from other hospital bed interrogations that we have found to be non-custodial. In *People v. Milhollin*, 751 P.2d 43, 50 (Colo.1988), this court held that "confinement to [a] hospital bed is insufficient alone to constitute custody." However, here, in determining that Petitioner was in custody, we do not rely only on the fact that Petitioner was confined to a hospital bed. Rather, we rely on a number of facts, outlined above, to come to the conclusion that, under the totality of the circumstances, a reasonable person in Petitioner's position would feel that his freedom of action was curtailed to a degree associated with formal arrest and not feel free to terminate the interrogation and leave. *Cf. People v. Miller*, 829 P.2d 443, 445 (Colo.App.1991) (no custody where only fact weighing in favor of custody determination was fact that defendant was confined to hospital); *People v. DeBoer*, 829 P.2d 447, 448 (Colo.App.1991) ("Although the defendant was confined to her hospital bed during the interview, the court found that there were no physical restraints on defendant at the time of the interview nor did the actions of the officers restrain defendant in any way.").

Accordingly, while we recognize that Petitioner was in the hospital in a largely immobile state for medical reasons unrelated to police conduct, and that Petitioner was informed that he was not under arrest, we nonetheless conclude that Petitioner was in custody at the time of the interrogation. *Minjarez*, 81 P.3d at 357 (fact interrogating officers informed the defendant that he was free to leave, when "all external circumstances appear[ed] to the contrary," did not render the interrogation non-custodial). Accordingly, we reverse the court of appeals' determination that Petitioner was not in custody for *Miranda* purposes at the time of the interrogation.

### B. Non-custodial Rights to Remain Silent and to Counsel

Petitioner next contends that, even if he was not in custody for *Miranda* purposes at

the time of the interrogation, the Fifth and Sixth Amendments to the United States Constitution require that once an individual has invoked his rights to remain silent and to counsel, questioning of the individual must cease. Having determined that Petitioner was in custody under *Miranda*, we need not address this issue.

## C. Voluntariness of Statements

 Under the due process clauses of the United States and Colorado Constitutions, a defendant's statements must be made voluntarily in order to be admissible into evidence. *Mincey v. Arizona*, 437 U.S. 385, 397, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *People v. Raffaelli*, 647 P.2d 230, 234 (Colo. 1982); U.S. Const. amends. V, XIV; Colo. Const. art. II, § 25. While statements made by a defendant in circumstances violating the strictures of *Miranda* are subject to only partial suppression, allowing the prosecution to use the statements for impeachment purposes, involuntary statements must be completely suppressed. *Id.* at 398, 98 S.Ct. 2408. Therefore, although we have determined that Petitioner's statements should be suppressed under *Miranda*, we nonetheless address the issue of whether the statements should be suppressed under the due process voluntariness standard because the remedy—partial suppression versus complete suppression—is different in each instance.

 To be voluntary, a statement must be "the product of an essentially free and unconstrained choice by its maker." *Raffaelli*, 647 P.2d at 234 (citing *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961)). A confession or inculpatory statement is involuntary if coercive governmental conduct played a significant role in inducing the statement. *People v. Gennings*, 808 P.2d 839, 843 (Colo.1991) (citing *Colorado v. Connelly*, 479 U.S. 157, 163–67, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)). Indeed, coercive government conduct is a "necessary predicate to the finding that a confession is not 'voluntary.'" *Connelly*, 479 U.S. at 167, 107 S.Ct. 515; *People v. Wood*, 135 P.3d 744, 749 (Colo.2006). Coercive police conduct includes not only physical abuse or threats directed against a person, but also

subtle forms of psychological coercion. *Gennings*, 808 P.2d at 843–44 (citing *Arizona v. Fulminante*, 499 U.S. 279, 287, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)); *People v. Miranda–Olivas*, 41 P.3d 658, 660–61 (Colo. 2001). The focus of the voluntariness question is "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined—a question to be answered with complete disregard of whether or not the [defendant] in fact spoke the truth." *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961).

 Whether a statement is voluntary must be evaluated on the basis of the totality of the circumstances under which it is given. *Raffaelli*, 647 P.2d at 235. "Relevant circumstances include the occurrences and events surrounding the confession and the mental condition of the person making the statement." *Id.* "While a defendant's mental condition, by itself and apart from its relationship to official coercion, does not resolve the issue of constitutional voluntariness, the deliberate exploitation of a person's weakness by psychological intimidation can under some circumstances constitute a form of governmental coercion that renders a statement involuntary." *Gennings*, 808 P.2d at 844 (citing *Connelly*, 479 U.S. at 164, 107 S.Ct. 515), *see also People v. Humphrey*, 132 P.3d 352, 361 (Colo.2006); *People v. Valdez*, 969 P.2d 208, 211 (Colo.1998). In *Gennings*, this court stated "the term 'totality of the circumstances' refers to the significant details surrounding and inhering in the interrogation under consideration." 808 P.2d at 844. There, we provided a non-exhaustive list of factors helpful to the voluntariness determination:

Whether the defendant was in custody or was free to leave and was aware of his situation; whether *Miranda* warnings were given prior to any interrogation and whether the defendant understood and waived his *Miranda* rights; whether the defendant had the opportunity to confer with counsel or anyone else prior to the interrogation; whether the challenged statement was made during the course of

an interrogation or instead was volunteered; whether any overt or implied threat or promise was directed to the defendant; the method and style employed by the interrogator in questioning the defendant and the length and place of the interrogation; and the defendant's mental and physical condition immediately prior to and during the interrogation, as well as his educational background, employment status, and prior experience with law enforcement and the criminal justice system.

*Id.*

The state bears the burden of establishing the voluntariness of the defendant's statement by a preponderance of the evidence. *Raffaelli*, 647 P.2d at 235. A trial court's findings of fact on the voluntariness of a statement will be upheld by this court on review where the finding is supported by adequate evidence in the record. *Id.* at 236. However, the ultimate determination of whether a statement is voluntary is a legal question and is reviewed de novo. *Gennings*, 808 P.2d at 839.

The trial court denied Petitioner's motion to suppress the statements on voluntariness grounds, finding that "the statements were not made as a result of coercion or intimidation." In reaching this conclusion, the court found that the investigating officers did not threaten Petitioner; the interrogation was conducted in conversational tones with "no loud noises"; the officers made no threats; neither officer brandished a weapon; and Petitioner was able to refuse to sign the medical release and, when he was formally arrested, he invoked his *Miranda* rights. Relying on these same facts, the court of appeals affirmed.

Petitioner disagrees and argues that while the investigating officers did not threaten him, the statements were nonetheless involuntary because, while in a weakened physical and mental state, the officers continued to question him in spite of his requests not to speak with them until he consulted an attorney.

After reviewing the totality of the circumstances, we agree with Petitioner and find that the statements were not "the product of an essentially free and unconstrained choice."

*Raffaelli*, 647 P.2d at 234. Rather, we find that the investigating officers' conduct was sufficient to overbear Petitioner's will to resist.

In reaching this conclusion, we rely on the following facts: (1) Petitioner was suffering from extreme depression at the time of the interrogation; (2) he had recently attempted suicide pursuant to a suicide pact with his wife and daughter; (3) he had recently learned that his wife and daughter had died; (4) the investigating officers were fully aware of Petitioner's mental condition and the failed suicide attempt at the time of the interrogation; (5) Petitioner was confined to a hospital bed; (6) the investigating officers failed to advise Petitioner of his *Miranda* rights and secure a waiver of those rights; (7) although he repeatedly stated that he wished to consult with an attorney before speaking with investigators, Petitioner was not afforded the opportunity to consult with counsel prior to the interrogation; (8) the investigating officers continued to question Petitioner after he stated that he did not wish to speak with them at that time; (9) the investigating officers informed him that he was not entitled to speak with an attorney; and (10) the statements were not volunteered, but were rather made during an interrogation in which Petitioner was confronted with the evidence against him.

Of particular significance is the investigating officers' continued questioning in the face of Petitioner's invocation of his rights to remain silent and to counsel. Petitioner was in a weakened physical and mental state and, knowing this fact, the investigating officers persisted in disregarding Petitioner's requests not to discuss the event until he had consulted with counsel. *See Gennings*, 808 P.2d at 844 ("While a defendant's mental condition, by itself and apart from its relationship to official coercion, does not resolve the issue of constitutional voluntariness, the deliberate exploitation of a person's weakness ... can under some circumstances constitute a form of governmental coercion that renders a statement involuntary." (citation omitted)); *People v. May*, 859 P.2d 879, 885 (Colo.1993). Although Petitioner expressed a desire not to discuss the events surround-

ing his wife and daughter's deaths, the investigating officers interrogated Petitioner in his hospital room, in close proximity, with the door closed. *See Mincey,* 437 U.S. at 398–99, 98 S.Ct. 2408 (statements made by suspect from hospital bed after he expressed wish not to be interrogated were involuntary). The questioning, while conducted in conversational tones, consisted of the officers confronting Petitioner with the evidence against him and essentially requesting agreement. *See Raffaelli,* 647 P.2d at 236 (repetitive questioning of defendant, fact defendant was "under substantial emotional stress" and was "distraught," and "accusatorial nature of interrogation," although conducted in conversational tone, constituted coercion rendering statements involuntary). Accordingly, we find that the statements made by Petitioner during the hospital room interrogation were not voluntary and should therefore be suppressed. Consequently, we reverse the court of appeals' determination on this issue.

### D. Prosecutorial Misconduct

 Finally, Petitioner argues that the statements he made during the hospital room interrogation require suppression because of prosecutorial misconduct. Specifically, Petitioner argues that the Deputy District Attorney's statement to Officers Sheets and Hodgkin that Petitioner was not entitled to an attorney constituted a violation of the Colorado Rules of Professional Conduct and the American Bar Association's Standards for Criminal Justice.

 In *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), the United States Supreme Court wrote that it was theoretically possible for "the conduct of law enforcement agents [to be] so outrageous that due-process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." The court suggested that such conduct would have to violate "that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." *Id.* at 432, 93 S.Ct. 1637 (quoting *Kinsella v. U.S. ex rel. Singleton,* 361 U.S. 234, 246, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960)). Colorado has specifi-

cally recognized the due-process claim of outrageous government conduct. *People v. Medina,* 51 P.3d 1006, 1011 (Colo.App.2001). Colorado defines "outrageous government conduct" in the same manner described by the Court in *Russell*—"conduct that violates fundamental fairness and is shocking to the universal sense of justice." *Id.*

Here, the issue of whether an individual who is not in custody has a constitutionally protected right to consult with counsel and, if so, the degree to which such a request must be honored, has not been decided by this court or the United States Supreme Court. Therefore, the Deputy District Attorney's statement was, at most, a reference to an undecided question of law. Further, the prosecutor's comment was made in the context of discussing the defendant's status, including the fact that he was not in legal custody and had not yet been charged with any criminal violation. In this context, the prosecutor was merely explaining that, in his opinion, Petitioner was not entitled to counsel. While it is debatable whether this was a misstatement of law, it did not rise to the level of outrageous government conduct. *Cf. People v. Auld,* 815 P.2d 956, 958 (Colo.App. 1991) (fictitious complaint drafted by district attorney for purpose of investigation of attorney suspected of receiving stolen property constituted outrageous government conduct). Accordingly, we affirm the court of appeals on this issue.

### IV. Conclusion

For the foregoing reasons, we affirm in part and reverse in part the decision of the court of appeals. We remand the case to the court of appeals with instructions to return the case to the trial court for a new trial consistent with this opinion.

Justice COATS dissents, and Justice RICE and Justice EID join in the dissent.

Justice COATS, dissenting.

Not since *People v. Connelly,* 702 P.2d 722 (Colo.1985), *rev'd sub nom. Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), has this court so clearly excluded a confession as involuntary in the absence of

880

any objectively coercive police conduct. I also believe the majority breaks new ground in finding a suspect to be in police "custody" for purposes of the prophylactic *Miranda* warnings as a result of his own medical limitations rather than any express or implied claim of authority by the police. Because I am convinced that the majority's conclusions in both the due-process and privilege-against-self-incrimination arenas reflect fundamental misinterpretations of governing federal law, I respectfully dissent.

The elasticity of a totality-of-the-circumstances analysis typically makes it possible for courts to avoid precise distinctions and explain their conclusions in terms of a non-specific balancing of various considerations. It often, therefore, becomes clear that any particular factor is essential to the balance only when it is completely absent. In *Connelly*, the absence of any state action whatsoever made it necessary for the Court to refine its articulation of the " 'old' due process voluntariness test," *Oregon v. Elstad*, 470 U.S. 298, 307–08, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (quoting Steven J. Schulhofer, *Confessions and the Court*, 79 Mich. L.Rev. 865, 877 (1981)), by explaining that despite its earlier references to a "rational intellect" and "free will," *see Mincey v. Arizona*, 437 U.S. 385, 398, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (quoting *Townsend v. Sain*, 372 U.S. 293, 307, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) (quoting *Blackburn v. Alabama*, 361 U.S. 199, 208, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960))), "coercive government misconduct" was always the "catalyst" for its due-process exclusion of confessions as involuntary. *Connelly*, 479 U.S. at 163, 107 S.Ct. 515. Although the Court there described this necessary predicate to finding a confession involuntary using terms like "official coercion," "police misconduct," "wrongful acts," "coercive tactics," "coercive police activity," "police overreaching," and "coercive government misconduct," *id.* at 163–67, 107 S.Ct. 515, the complete absence of any police conduct in *Connelly* has given some lower courts, including this one, a small opening to de-emphasize the significance of governmental coercion in the voluntariness calculus and correspondingly overemphasize the defen-

dant's mental state. *See, e.g., People v. Humphrey*, 132 P.3d 352, 362 (Colo.2006).

Because the police in this case actually did *something*, the majority considers this case, as it has others in the past, to be distinguishable from *Connelly*. Because the police, however, did nothing even arguably intimidating or physically coercive to the defendant, the majority's opinion necessarily reflects the narrowness of its reading of *Connelly*. Ignoring the importance of wrongful or improper police conduct to *Connelly's* rationale, the majority continues to exclude any confession causally related to some kind of state action, unless it is proven to be "the product of an essentially free and unconstrained choice." Maj. op. at 877 (reviving this court's pre-*Connelly* jurisprudence in *People v. Raffaelli*, 647 P.2d 230, 234 (Colo.1982)). The majority therefore understands the Due Process Clause to require suppression whenever a defendant's subjective "will to resist" is sufficiently fragile to be "overborne" by an investigating officer's conduct, however innocuous and proper that conduct may be. *Id.*

That *Connelly* did not merely mandate a predicate of some state action, but rather required the confession to be causally connected to police "misconduct," seems clear enough from both its choice of language and its underlying rationale. Other courts have had little difficulty in understanding *Connelly* to require some "objectively coercive" police activity before even examining the accused's subjective state of mind and the sufficiency of the "coercion" in question to overbear his will. *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir.1988) (following *United States v. Rohrbach*, 813 F.2d 142, 144 (8th Cir.1987), and creating a three-part voluntariness test that first considers whether "the police activity was objectively coercive"); *State v. Carrillo*, 156 Ariz. 125, 750 P.2d 883, 894–95 (1988) ("Under *Connelly*, the question of voluntariness is to be determined by an objective evaluation of police conduct and not by [the] defendant's subjective perception of reality."). To the extent that this court's rejection of any requirement of objectively coercive police conduct had thus far remained unclear, with

today's holding that can no longer be the case.

Not only was the defendant informed that he had not been charged with a crime and was not in legal custody of any kind, but through his own statements, he made clear his understanding that he found himself in a hospital room for medical, not legal, reasons and that he fully expected to be released by at least the following day. Not only was it undisputed that his inculpatory statements were not the product of intimidation, physical coercion, or deception of any kind but also that the police initially left without speaking to him when medical staff recommended as much and upon their return the next day, when the defendant indicated his unwillingness to sign a medical release or answer questions about his property or wife, they made clear to him that they would not question him but would merely tell him what the evidence suggested, a course of action they followed until after he confirmed that their "surmises" were correct.

The majority does not appear to dispute these facts but openly holds that in light of the defendant's weakened physical and mental state, confronting him with the evidence against him, even in this conversational and unthreatening manner, was sufficient to constitute coercion. In doing so, the majority indisputably rejects any notion that due process is implicated only by some inherently offensive or wrongful police conduct and instead interprets *Connelly* only to have modified the Court's prior voluntariness jurisprudence to require sufficient state action to implicate the Fourteenth Amendment. Not only would state action of this kind be necessarily involved in the mere use of a confession in a criminal prosecution but interpreting the term "coercive," as the majority does, to refer only to the effect, as distinguished from the inherent nature, of police conduct is simply incompatible with the Supreme Court's synonymous usage of terms like "wrongful" and "misconduct."

If the majority were confident of this interpretation of the old due process voluntariness test, it would, of course, be unnecessary to additionally address *Miranda's* prophylactic warnings. More importantly, however, the majority's interpretation of the "custody" predicate for *Miranda* warnings is no less strained than its voluntariness rationale. I do not consider the combination of two equally unconvincing arguments for reversal to improve the logical force or persuasiveness of either.

In its finding that the defendant was in "custody," the majority does not appear to contest the defendant's appreciation of the fact that he was not in legal custody but was being visited by detectives, in a hospital room where he was regularly attended by medical staff and family, or that his refusals to grant access to his medical records or answer questions were honored by the detectives. Nor does the majority suggest that a reasonable person would not have understood that any restrictions on his movement were imposed by his doctors and medical condition rather than the police. Instead, it finds that the defendant was in custody largely because, as a practical matter, he lacked the physical capacity to remove himself from the presence of the detectives or make them stop talking to him.

Relying heavily on an isolated sentence from a case addressing the obligation of federal habeas courts to review determinations of "custody," as distinguished from addressing the meaning of "custody" itself, the majority finds and attaches great significance to the fact that a reasonable person in the defendant's circumstances would have felt himself "not at liberty to terminate the interrogation and leave." *See Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). Because the detectives continued to confront the defendant with their findings despite his refusal to answer questions, the majority finds it reasonable for him to have felt himself "not free to terminate the communication." Maj. op. at 876. Although more is clearly implied by custody for purposes of *Miranda*, I believe that for an individual whose freedom of movement is restricted for reasons other than official police action to be considered in custody, a reasonable person· in similar circumstances must feel himself no longer free to decline to cooperate with the investigation.

With regard to investigatory stops, a less intrusive form of personal seizure than a formal arrest, the Supreme Court has clearly held that an individual whose freedom of movement is restricted by circumstances other than legal authority is not "stopped" merely because he cannot leave. He is subject to a stop only if he reasonably feels he cannot refuse to cooperate. *Florida v. Bostick*, 501 U.S. 429, 436, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (explaining that in bus sweep for narcotics "[the Defendant's] movements were 'confined' in a sense, but this was the natural result of his decision to take the bus; it says nothing about whether or not the police conduct at issue was coercive"). Although "custody" sufficient to implicate the privilege against self-incrimination outside of legal proceedings requires a reasonable perception of the equivalent of a formal arrest rather than merely an investigatory stop, the difference is one of degree and not the factors to be considered. *See* Maj. op. at 875 (considering a set of factors similar to those set forth in *United States v. Mendenhall*, 446 U.S. 544, 554–55, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). It would be illogical and facially absurd to find it reasonable for one to believe he has effectively been arrested if he could not even reasonably believe he has been stopped. In addition to other indicia of an arrest (which I consider absent from this case), the majority should therefore have considered whether the defendant reasonably felt himself not at liberty to refrain from commenting on the detectives' evidence rather than whether he could make the detectives remain silent or leave.

. Although the United States Supreme Court may not, under the unique circumstances of this case, have completely foreclosed either of the majority's holdings, in light of its existing jurisprudence and the interpretation of that jurisprudence by a number of other jurisdictions, I feel confident that faced with these circumstances, the Supreme Court would reject the majority's understanding and application of both the old due process voluntariness test and the Court's own *Miranda* doctrine. I therefore respectfully dissent.

I am authorized to state that Justice RICE and Justice EID join in this dissent.