The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
March 11, 2021

## 2021COA33

**No. 20CA0695, People in the Interest of My.K.M. — Juvenile Court — Dependency and Neglect — Termination of the Parent-Child Legal Relationship; American Indian Law — ICWA — Indian Child — Remedial and Rehabilitative Programs**

As a matter of first impression in Colorado, a division of the court of appeals holds that a child's membership in a tribe, even absent eligibility for enrollment, is sufficient for a child to be an Indian child under the Indian Child Welfare Act.

Court of Appeals No. 20CA0695
City and County of Denver Juvenile Court No. 16JV1388
Honorable Donna J. Schmalberger, Judge

The People of the State of Colorado,

Appellee,

In the Interest of My.K.M. and Ma.K.M, Children,

and Concerning V.K.L. and T.A.M.,

Respondent-Appellants.

---

JUDGMENT AFFIRMED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE TOW
Dailey and Berger, JJ., concur

Announced March 11, 2021

---

Kristin M. Bronson, City Attorney, Cathleen M. Giovannini, Assistant City
Attorney, Denver, Colorado, for Appellee

Barry Meinster, Guardian Ad Litem

Joel M. Pratt, Office of Respondent Parents' Counsel, Colorado Springs,
Colorado, for Appellant V.K.L.

Patrick R. Henson, Office of Respondent Parents' Counsel, Chelsea A. Carr,
Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant T.A.M.

¶ 1     Mother, V.K.L., and father, T.A.M., appeal the juvenile court's judgment terminating their parent-child legal relationships with My.K.M. and Ma.K.M.  Mother's appeal presents an issue of first impression in Colorado: whether enrollment in a tribe, or merely tribal membership even absent enrollment, determines whether a child is an Indian child under the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901-1963.  We conclude that tribal membership, not enrollment, determines ICWA's applicability.

¶ 2     The juvenile court ultimately recognized that ICWA applied to this case, in which the children are tribal members but not eligible for enrollment.  However, we conclude that the juvenile court erroneously found that the Denver Department of Human Services (the Department) provided active efforts for mother as required by ICWA.  Thus, we reverse the termination of mother's parent-child legal relationships with the children and remand the case for further proceedings as to her.  But because the record supports the juvenile court's judgment as to father, we affirm the termination of his parent-child legal relationships with the children.

## I. Background

¶ 3     In October 2016, father took twelve-month-old Ma.K.M. to a hospital emergency department because she was lethargic and breathing poorly.  Hospital staff contacted the police because father appeared intoxicated and they suspected that the child had ingested a controlled substance.  Hospital staff reported that the child's pupils were dilated, she was unresponsive, and she required intubation because she was unable to breathe on her own.  Father appeared calm at first but became agitated and tried to flee when asked to write an account of how the child had become ill.  He told the police that five-year-old My.K.M. was with mother, but officers found the child home alone.  Mother could not be located.

¶ 4     While the younger child remained in the hospital, the Department placed the elder child in emergency foster care and filed a petition in dependency or neglect.  In addition to these events, the petition described both parents' substance use and a 2014 dependency or neglect case that had been closed seven months earlier after My.K.M. spent a year in foster care.

¶ 5     The juvenile court held a temporary custody hearing and ordered father to vacate the home so the children could return to

mother's care. One week later, both children returned home to mother. In late 2016, the juvenile court found the children were dependent or neglected, entered an adjudication order concerning father, entered a deferred adjudication concerning mother, and approved treatment plans for both parents. After mother tested positive for cocaine, the juvenile court revoked mother's deferral and entered an adjudicatory order against her in November 2017.

¶ 6 The following facts are undisputed. Father subsequently moved back into the family home. In October 2018, father was involved in a collision that resulted in criminal charges against him and the loss of the family car. Shortly thereafter, mother reported that father had assaulted her in front of the children. As a result, the juvenile court again ordered father to vacate the home. In mid-November 2018, the juvenile court placed the children in foster care after mother failed to pick them up from school and daycare and could not be located. Mother later admitted that she had relapsed.

¶ 7 The Department later filed a motion to terminate the parents' rights. Following a six-day termination hearing from January 2020

through March 2020, the juvenile court terminated both parents' parental rights.

## II.     Mother's Appeal

¶ 8     Mother contends that the juvenile court reversibly erred because it failed to recognize that ICWA governs the case until just before the termination hearing.  She also argues that the Department failed to make active efforts for her.  We reject mother's first contention but agree with the second.

### A.     The Juvenile Court's Untimely ICWA Finding Does Not Require Reversal

¶ 9     Mother contends that the juvenile court erred by failing to apply the ICWA standards to the proceeding until the beginning of the termination hearing despite mother's prompt disclosure that she is a member of a federally recognized Indian tribe.  We agree that the court erred by not timely recognizing the children's Indian status, but we disagree that the error provides grounds for reversal.

#### 1.     Factual Background

¶ 10     A representative of the Colville Confederated Tribes appeared at the temporary custody hearing in October 2016.  She confirmed that mother is an enrolled member of the Tribe.  The tribal

representative said she "ha[d] not been able to verify whether the children [were] eligible for enrollment . . . [b]ut they would be considered members."

¶ 11 The juvenile court made no findings regarding the children's Indian status or the applicability of ICWA. Instead, one week later, the court ordered mother to complete an ICWA assessment form — even though the court already knew that the children were members of the Colville Confederated Tribes. In March 2017, the juvenile court ruled that because the children are not eligible for enrollment, ICWA did not apply.

¶ 12 At a hearing in November 2018, the presiding magistrate asked whether the case was subject to ICWA. The county attorney reported that the Tribe had not responded to the ICWA notice and the Department planned to ask for a written response.

¶ 13 The Department filed a motion to terminate parental rights on October 4, 2019. On October 21, 2019, the juvenile court held a status conference. The Department reported that it had asked the tribal representative to confirm in writing whether the children were eligible for enrollment in the Tribe. The tribal representative had responded — just as she had three years earlier — that the Tribe

5

considered the children to be members. The county attorney said he was waiting to hear whether the Tribe thought ICWA applied to the case. The juvenile court opined that membership absent enrollment represented an "ICWA gray area" and recalled that the Tribe had indicated it would not intervene or participate in the case. (We find no support in the record for this assertion.)

¶ 14 The juvenile court began the termination hearing on November 6, 2019. The county attorney informed the court that the Tribe considered the case to be subject to ICWA because the children are tribal members. The juvenile court found there was reason to know the children are Indian children and continued the case so the parties could consult with the Tribe.

¶ 15 The Tribe participated in the rest of the proceedings, and the juvenile court applied ICWA's provisions when it terminated the parents' parental rights.

### 2. Tribal Membership, Not Enrollment, Determines ICWA's Applicability

¶ 16 We review the juvenile court's interpretation and application of ICWA de novo. *People in Interest of A.R.*, 2012 COA 195M, ¶ 17. When construing a federal statute, our goal is to give effect to

congressional intent and purpose.  *In re N.B.*, 199 P.3d 16, 18 (Colo. App. 2007).  We look first to the plain language of the statute, giving words and phrases their plain and ordinary meanings.  *Id.*; *see also Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 100 (2012).  If the meaning is clear and unambiguous, we do not resort to other rules of statutory interpretation.  *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 409 (1993) (when interpreting a federal statute, judicial inquiry is complete if the intent of Congress is clear from the language of the statute).  We must construe ICWA liberally in favor of Indian interests, with ambiguous provisions interpreted to benefit Indians and tribes.  *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985); *People in Interest of D.B.*, 2017 COA 139, ¶ 10.

¶ 17     The statutory definition of "Indian child" turns on membership rather than enrollment.  ICWA defines an Indian child as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."  25 U.S.C. § 1903(4).

> Enrollment is not always required in order to be a member of a tribe.  Some tribes do not have written rolls.  Others have rolls that list

> only persons that were members as of a certain date.  Enrollment is the common evidentiary means of establishing Indian status, but it is not the only means nor is it necessarily determinative.

Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584, 67,586 (Nov. 26, 1979).

¶ 18    Thus, for purposes of ICWA, a person may be a member of a tribe without being enrolled in the tribe.  *See In re Adoption of C.D.*, 751 N.W.2d 236, 243 (N.D. 2008); *In re Z.J.G.*, 448 P.3d 175, 184 (Wash. Ct. App. 2019) ("Depending on the practices of the specific tribe, enrollment and membership may be but are not necessarily synonymous."), *rev'd on other grounds*, 471 P.3d 853 (Wash. 2020); *In re Termination of Parental Rights to Arianna R.G.*, 657 N.W.2d 363, 369 (Wis. 2003).  Indeed, tribal membership criteria, classifications of membership, and interpretation of membership laws are unique to each tribe and vary across tribal nations.  *See* Tommy Miller, Comment, *Beyond Blood Quantum: The Legal and Political Implications of Expanding Tribal Enrollment*, 3 Am. Indian L. J. 323, 323 (Dec. 15, 2014), https://perma.cc/3FV6-VU9M (describing a range of approaches to tribal citizenship).

¶ 19    A tribe's determination that a person is a member or is eligible for membership is conclusive and binding. *People in Interest of J.A.S.*, 160 P.3d 257, 260 (Colo. App. 2007).  Thus, all that is necessary to establish a child's Indian status is admissible evidence that the tribe has determined either that the child is a member or that the child is eligible for membership and a biological parent is a member.

¶ 20    Here, the tribal representative told the juvenile court at the temporary custody hearing that the Tribe considered the children to be members regardless of their enrollment status.  This information established conclusively that the children are Indian children under 25 U.S.C. § 1903(4).  Thus, the juvenile court erred by finding that ICWA did not apply to the proceeding because the children are not eligible for enrollment in the Tribe.

### 3.    The Delay in Identifying the Children as Indian Children Does Not Provide an Independent Basis for Reversal

¶ 21    Mother contends that the three-year delay in identifying the children as Indian children requires reversal.  While we agree that such an extreme delay is troubling, we disagree that the delay itself requires reversal in this case.

9

¶ 22     ICWA's protections "are designed to keep children, when possible, with their parents, family, or Tribal community."  Bureau of Indian Affairs, Guidelines for Implementing the Indian Child Welfare Act 11, 12 (Dec. 2016), https://perma.cc/3TCH-8HQM (2016 Guidelines).  To that end, courts must follow ICWA's requirements from the early stages of a case and avoid the harmful delays and duplication that may result from late application of ICWA.  *Id.*  Thus,

> [i]f there is reason to know the child is an Indian child, but the court does not have sufficient evidence to determine that the child is or is not an "Indian child," the court must . . . [t]reat the child as an Indian child, unless and until it is determined on the record that the child does not meet the definition of an "Indian child."

25 C.F.R. § 23.107(b)(2) (2020); *see also* § 19-1-126(2)(b), C.R.S. 2020.

¶ 23     Here, there was more than "reason to know."  The juvenile court had sufficient information to determine at the temporary custody hearing that the children were Indian children.  Under these circumstances, the failure of the juvenile court and the Department to recognize their duty to apply ICWA's protections

contravened the letter and spirit of ICWA and Colorado's ICWA-implementing legislation and risked delay, disruption, and avoidable separation for the children and family.

¶ 24 Nevertheless, we consider and reject mother's specific assertions as follows.

¶ 25 First, mother contends that the Department did not meet its obligation to exercise due diligence to work with the Tribe to determine whether the children were Indian children. *See People in Interest of L.L.*, 2017 COA 38, ¶ 29 (when there is reason to know a child may be an Indian child, the department must exercise due diligence to identify and work with relevant tribes); *see also* 2016 Guidelines at 11. But, as discussed above, the juvenile court already had sufficient information at the temporary custody hearing to determine that the children were Indian children. So, the Department's lack of diligence in this regard does not alter our analysis of whether the juvenile court and the Department complied with ICWA's substantive provisions.

¶ 26 Second, mother asserts that the juvenile court erred by considering retroactively whether the Department complied with ICWA's requirement to make active efforts to prevent the breakup of

11

the family throughout the case in the absence of a timely finding that the children are Indian children. *See* 25 U.S.C. § 1912(d). She contends that the Department could not have met the active efforts standard as a matter of law if it believed it only needed to make reasonable efforts. *See* §§ 19-1-103(89), 19-3-100.5, 19-3-604(2)(h), C.R.S. 2020 (state must make reasonable efforts to rehabilitate unfit parents and reunite families); *see also People in Interest of A.V.*, 2012 COA 210, ¶ 11 (active efforts requires more than reasonable efforts, and at least some efforts should be culturally relevant).

¶ 27 True, the Department may have been *less likely* to meet the active efforts standard because the juvenile court did not timely rule that the standard applied. But the Department's awareness of its obligation is irrelevant to the question whether the services it provided met the active efforts standard. *Cf. A.R.*, ¶ 32 (holding that, even though juvenile court applied a "best efforts" standard, rather than "active efforts," the appellate court would nevertheless review whether "the record support[ed] the court's determination that the department's actions met the requisite standard").

### B. The Juvenile Court Erred By Finding That the Department Provided Active Efforts for Mother

¶ 28 Mother contends that the Department did not make sufficient active efforts to provide (1) employment services; (2) housing assistance after she lost her home; or (3) services specific to mother's Tribe. We agree that the Department did not provide necessary employment assistance. Thus, the juvenile court reversibly erred by finding that the Department made active efforts with regard to mother.

¶ 29 Any party seeking to terminate parental rights to an Indian child must satisfy the court that (1) active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and (2) these efforts have been unsuccessful. 25 U.S.C. § 1912(d). Whether the Department made adequate active efforts is a mixed question of fact and law. *A.V.*, ¶ 13; *People in Interest of C.Z.*, 262 P.3d 895, 905 (Colo. App 2010). We review de novo the legal issues in such mixed questions. *A.V.*, ¶ 13.

¶ 30 In *C.Z.*, the division reviewed the juvenile court's factual findings for abuse of discretion. 262 P.3d at 905. At least three

13

divisions have since followed this approach. *A.V.*, ¶ 13 (citing *C.Z.*, 262 P.3d at 905); *A.R.*, ¶ 19 (same); *People in Interest of T.E.R.*, 2013 COA 79, ¶ 34 (citing *A.V.*, ¶ 13). Notably, however, in invoking this standard of review, the division in *C.Z.* cited *Neal M. v. State*, 214 P.3d 284 (Alaska 2009). But in *Neal M.*, the Alaska Supreme Court actually reviewed for clear error. 214 P.3d at 290 ("We 'will reverse the factual findings of the superior court in a termination of parental rights case only when those findings are clearly erroneous.'" (quoting *Martin N. v. State*, 79 P.3d 50, 53 (Alaska 2003))).

¶ 31     Indeed, our supreme court generally reviews for clear error a juvenile court's factual findings in dependency and neglect cases. *See People in Interest of A.J.L.*, 243 P.3d 244, 250 (Colo. 2010) ("[W]e set aside a trial court's factual findings only when they are 'so clearly erroneous as to find no support in the record.") (quoting *People in Interest of C.A.K.*, 652 P.2d 603, 613 (Colo. 1982)).[1]

---

[1] We recognize that, in other contexts, our supreme court has reviewed a trial court's factual findings for an abuse of discretion. *See, e.g., E-470 Pub. Highway Auth. v. 455 Co.*, 3 P.3d 18, 22-23 (Colo. 2000) (discussing the variety of possible methods of reviewing factual findings and ultimately adopting an abuse of discretion

14

Significantly, in each of the cases in which the division reviewed for abuse of discretion, the division ultimately affirmed because the findings under review had record support. *C.Z.*, 262 P.3d at 905; *A.V.*, ¶ 14; *A.R.*, ¶ 34; *T.E.R.*, ¶ 39. Thus, referring to the standard of review in these cases as an "abuse of discretion" review may have been a misnomer.

¶ 32    To the extent it was not, however, we disagree that the correct standard of review is for abuse of discretion, and thus decline to follow *C.Z.* and the cases that followed it. *See A.V.*, ¶ 11 n.1 ("One division [of the court of appeals] is not bound by the holding of another division.") Instead, we review for clear error. *A.J.L.*, 243 P.3d at 250.

¶ 33    The goal of active efforts is to remedy the basis for the dependency or neglect proceeding; thus, the type of services required depends on the facts of each case. *In re Michael G.*, 74 Cal. Rptr. 2d 642, 650 (Ct. App. 1998); *see also* 25 C.F.R. § 23.2 (2020) (active efforts must be tailored to the facts and

standard for reviewing the findings in a condemnation case). But we are aware of no case in which the supreme court has reviewed a juvenile court's findings for abuse of discretion in a case involving termination of a parent-child legal relationship.

15

circumstances of the case); *People in Interest of A.M.D.*, 648 P.2d 625, 640 (Colo. 1982) (primary purpose of a dependency or neglect proceeding is to preserve and mend familial ties).

¶ 34    "Active efforts" is a higher standard than Colorado's "reasonable efforts" requirement.  *A.R.*, ¶ 28.  For example,

> "reasonable efforts" may be satisfied by requiring a parent to find a job, to acquire new housing, and to terminate a relationship with what is perceived to be a boyfriend who is a bad influence; in contrast, "active efforts" under the ICWA would require that the caseworker help the client develop job and parenting skills necessary to retain custody of her child.

*Id.* (citing *A.A. v. State*, 982 P.2d 256, 261 (Alaska 1999)).  Giving a parent a treatment plan and passively waiting for the parent to follow it does not satisfy the active efforts standard.  *See id.* "[A]ctive efforts require that the state actually help the parent develop the skills required to keep custody of the children." *Dashiell R. v. State, Dep't of Health & Soc. Servs., Off. of Children's Servs.*, 222 P.3d 841, 849 (Alaska 2009).

¶ 35    A general failure to make active efforts for a short period of time during the course of a lengthy dependency or neglect proceeding is not, by itself, dispositive of whether the department

16

made active efforts overall. *See Maisy W. v. State ex rel. Dep't of Health & Soc. Servs., Off. of Children's Servs.*, 175 P.3d 1263, 1269 (Alaska 2008) (where state conceded that it failed to make active efforts for three months in the middle of a three-year proceeding, court properly looked to entirety of state's efforts). Similarly, the department need not provide every imaginable service or program. *Yvonne L. v. Ariz. Dep't of Econ. Sec.*, 258 P.3d 233, 241 (Ariz. Ct. App. 2011); *In re Beers*, 926 N.W.2d 832, 847 (Mich. Ct. App. 2018) (upholding active efforts finding where mother was offered all relevant services).

¶ 36 But even significant efforts by the department may not satisfy the active efforts requirement if a critical service is overlooked. *See Dep't of Hum. Servs. v. D.L.H.*, 284 P.3d 1233, 1242-43 (Or. Ct. App. 2012) (services did not include parenting classes to address incarcerated father's need to develop parental relationship with child); *see also In re Interest of Jamyia M.*, 791 N.W.2d 343, 349 (Neb. Ct. App. 2010) (department provided education, financial support, and transportation for parents of child with shaken baby syndrome, but court denied visitation and efforts were not culturally relevant).

¶ 37    Mother's treatment plan required her to have a legal form of income sufficient to support herself and the children. The plan directed mother to provide income documentation to the Department, pay all of her bills and rent on time, and provide the basic necessities for herself and the children, including food, clothing, and shelter. The plan did not identify any services that the Department would provide to assist mother in reaching these goals.

¶ 38    Mother requested job training at a hearing in June 2017 to help her meet her treatment plan's employment requirement. The county attorney said that the Denver Indian Family Resource Center (DIFRC) provided such services but might not be willing to work with mother because it had already discontinued services due to the parents' lack of engagement. Noting that DIFRC had previously provided in-home services and not job training, the juvenile court ordered the Department to help mother get job training services, whether from DIFRC or another provider.

¶ 39    At a hearing a month later, mother's counsel reported that nothing had been done to arrange job training for mother. The court, with a different judicial officer presiding, noted that DIFRC

had previously discontinued services for the parents due to lack of engagement. The court did not acknowledge the prior order to determine whether DIFRC would be willing to provide job training for mother and, if not, to arrange job training services through a different provider. The court also noted that the family had refused day care services. But the written court report by the Court Appointed Special Advocate (CASA) stated that *father* had refused day care services, insisting that mother would stay home with the children. The CASA made the same report in March 2018. And in April 2018, the CASA reported that mother said she wanted to get a job, but "every mention of employment [was] generally contradicted by [father] saying [mother would] be a stay at home mother."

¶ 40    There is no indication in the record that the Department offered mother job training or employment assistance of any kind. Instead, the caseworker's reports chronicled mother's unsuccessful efforts to find employment and her unsuccessful application for Supplemental Security Income benefits.

¶ 41    Thus, the record demonstrates that the Department required mother to have a legal form of income adequate to support herself and the children and passively waited for her to comply without

19

offering any services — even though mother requested job training and the juvenile court ordered the Department to provide that service. This does not meet the active efforts standard. *See A.V.,* ¶ 28.

¶ 42 We therefore conclude that the juvenile court erred by finding that the Department made active efforts to provide remedial services and rehabilitative programs for mother. Because the failure to make active efforts warrants reversal, we decline to address mother's remaining contentions that

- the Department did not provide active efforts because it did not provide adequate housing assistance or services specific to her Tribe;

- the juvenile court erred by not placing the children in accordance with ICWA's placement preferences; and

- the Department did not make reasonable accommodations for her cognitive disability in accordance with the Americans with Disabilities Act, 42 U.S.C. § 12131.

### III. Father's Appeal

¶ 43 Father contends that the juvenile court erred by finding that his treatment plan was appropriate because the plan did not

address his mental health needs.  He also argues that the juvenile court erred by finding that the Department had engaged in active efforts as to him.  We disagree with both contentions.

### A. The Juvenile Court Did Not Err By Finding That Father's Treatment Plan Was Appropriate

¶ 44    Before terminating the parent-child legal relationship, the juvenile court must find that the parent did not reasonably comply with an appropriate court-approved treatment plan or the plan was not successful.  § 19-3-604(1)(c)(1).  A treatment plan is appropriate if it "is reasonably calculated to render the particular [parent] fit to provide adequate parenting to the child within a reasonable time" and "relates to the child's needs."  § 19-1-103(10).  We measure the appropriateness of a treatment plan by its likelihood of success in reuniting the family, which we assess in light of the facts existing at the time of the plan's approval.  *People in Interest of B.C.*, 122 P.3d 1067, 1071 (Colo. App. 2005).  The fact that a treatment plan is not ultimately successful does not mean that it was inappropriate.  *People in Interest of M.M.*, 726 P.2d 1108, 1121 (Colo. 1986).

¶ 45    Father's treatment plan required him to (1) obtain and maintain suitable housing; (2) cooperate with the Department; (3)

ensure that the children were appropriately supervised; (4) maintain visitation; (5) complete a substance abuse evaluation and follow all recommendations; (6) cease all criminal activity; (7) provide financial support for the children; (8) cooperate with in-home services to improve his parenting skills; and (9) complete a domestic violence evaluation and any recommended treatment.

¶ 46 True, the treatment plan did not include a specific mental health objective. But it did require father to follow all recommendations arising from his substance abuse and domestic violence evaluations. The caseworker testified that father's domestic violence treatment provider recommended that father undergo a psychological evaluation, but father refused. She said that without the evaluation, the Department could not identify what additional mental health services would be appropriate.

¶ 47 We agree that the better practice is to impose a separate objective to address mental health evaluations and treatment when those concerns arise. But in this case, father refused to comply with his treatment plan by completing the recommended psychological evaluation. Under these circumstances, we conclude that father's treatment plan adequately addressed his mental health

22

needs to the extent possible. *Accord T.E.R.*, ¶ 33 (court may consider parent's unwillingness to participate in treatment as a factor in determining whether department made active efforts to prevent breakup of an Indian family); *People in Interest of K.T.*, 129 P.3d 1080, 1082 (Colo. App. 2005) (parent's refusal to document sobriety and participate in substance abuse treatment shows lack of commitment to meeting child's needs and is evidence of unfitness).

¶ 48    We therefore conclude that the juvenile court did not err by finding that father's treatment plan was appropriate.

### B.    The Juvenile Court Did Not Err By Finding That the Department Made Active Efforts for Father

¶ 49    Finally, we turn to father's challenge to the juvenile court's active efforts finding. Father contends that the burden of proof against which we should test the sufficiency of the evidence of active efforts is the beyond a reasonable doubt standard. We note that divisions of this court have disagreed about whether to apply the clear and convincing burden of proof or the higher beyond a reasonable doubt standard to findings made pursuant to 25 U.S.C. § 1912(d). *Compare C.Z.*, 262 P.3d at 905 (applying the clear and

convincing evidence standard), *with People in Interest of R.L.*, 961 P.2d 606, 609 (Colo. App. 1998) (applying the beyond a reasonable doubt standard). Because the juvenile court found that the Department met its burden of proof under the higher standard and we agree that sufficient evidence supports that finding, we need not decide which standard applies.[2]

¶ 50 Making active efforts does not mean persisting with futile efforts, and the Department is not required to make active efforts for parents who voluntarily absent themselves from the proceedings and cannot be located. *A.V.*, ¶ 12. A parent's unwillingness to participate in treatment is relevant to the determination whether the Department has made active efforts. *Id.*

¶ 51 The caseworker testified as follows:

- Father's domestic violence treatment provider recommended that father undergo a psychological evaluation.

- Father refused. Instead, he offered to provide the results of a psychological evaluation he had completed in 2015.

---

[2] Conversely, because there was no evidence that the Department provided any employment services for mother, the evidence did not support the juvenile court's finding as to mother under either standard.

24

- Father ultimately refused to release the results of the prior evaluation or complete a new evaluation.

¶ 52　Without father's cooperation, additional referrals for psychological evaluations or mental health treatment would have been futile. *See A.V.*, ¶ 12. As a result, we conclude that the juvenile court did not err by finding that the Department made active efforts as to father despite the lack of additional mental health services for father.

## IV.　Conclusion

¶ 53　The judgment terminating mother's parent-child legal relationships with the children is reversed and the case is remanded to the juvenile court for further proceedings. The judgment terminating father's parent-child legal relationships with the children is affirmed.

JUDGE DAILEY and JUDGE BERGER concur.