22CA1071 Peo v Cotter 12-04-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA1071
Weld County District Court No. 19CR3082
Honorable Vincente G. Vigil, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Matthew Cotter,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE YUN
Freyre and Pawar, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 4, 2025

---

Philip J. Weiser, Attorney General, Cata A. Cuneo, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Mackenzie R. Shields, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Matthew Cotter appeals the judgment of conviction entered after a jury found him guilty of attempted first degree murder, attempted first degree assault, and other crimes.  He contends that (1) the prosecution presented insufficient evidence to sustain three of his attempted murder and assault convictions; (2) the court erroneously denied his motion to suppress; and (3) the court admitted improper evidence during trial.  We disagree and affirm the convictions.

## I.     Background

¶ 2     One evening, Cotter went on a long drive to "get away."  During the drive, Cotter drank gin, called friends, and texted his ex-girlfriend, A.C.

¶ 3     Later that evening, 911 dispatchers received three calls about Cotter.  The first call, around 8 or 9 p.m., came from A.C.'s mother, who reported that he was harassing A.C.  Cotter had driven to A.C.'s house and was waiting outside.  A friend of Cotter's had told A.C. that Cotter had a gun.  In response to this call, police officers, including Officer Jeremy Sagner, arrived at A.C.'s house.  They were unable to locate Cotter, but Officer Sagner left a voicemail, informing Cotter that A.C. did not want any contact and offering his

own contact information if Cotter needed to talk to someone. Cotter did not answer, but at 9:31 p.m., he texted a friend: "If the cops are where I'm going to I guess I'm dying tonight[.]"

¶ 4 Around 10 or 11 p.m., A.C. and her father made the second and third 911 calls, after Cotter returned to their house with a loaded gun. As police responded again, A.C.'s family hid in a closet. Upon hearing the approaching sirens and seeing the flashing police lights, Cotter also hid, crouching behind the gated fence beside A.C.'s house with a loaded gun.

¶ 5 Around 10:50 p.m., five officers arrived, turned off their sirens to avoid an ambush, and split up to search the area. Through a crack in the gate, Cotter saw at least three armed, uniformed officers approaching with flashlights. The following photographs show the front patio and gated fence:



The photograph on the left shows two units; the unlit entryway on the left is A.C.'s. The photograph on the right shows the gated fence between the two units.

¶ 6     One officer approached the front patio, with the gated fence on his right, followed closely by Officer Sagner. This officer stepped off the front patio to inspect the fence and was temporarily blocked from Officer Sagner's view by a corner pillar. At that moment, Cotter, in his own words, "caught them off guard" and fired three shots through a crack in the gate. The first shot struck the approaching officer in the head.

¶ 7     Officer Sagner observed this officer fall onto his back and instructed two others to pull him to safety. While the wounded officer was dragged out of the line of fire, Officer Sagner caught sight of a figure through the fence and returned fire, striking Cotter three times. Although one of Cotter's three shots had hit the pillar where Officer Sagner was positioned, Officer Sagner was not injured. The officers arrested Cotter.

¶ 8     Cotter received treatment for his wounds at the hospital. While there, a detective from the police department interviewed Cotter about the incident, during which Cotter remarked, "I know I

hit the first one. I don't know if I hit him again after that." Cotter also said that he had "blacked out" but later recalled firing at least three shots.

¶ 9 The People charged Cotter with (1) two counts of attempted first degree murder (after deliberation); (2) two counts of attempted first degree murder (extreme indifference); (3) first degree assault; (4) attempted first degree assault; and (5) six crime of violence sentence enhancers. Cotter was convicted on all counts and received two consecutive forty-eight-year prison sentences.

¶ 10 Cotter now appeals.

## II. Sufficiency of the Evidence

¶ 11 Cotter contends that his convictions for the attempted first degree murder (after deliberation), attempted first degree murder (extreme indifference), and attempted first degree assault (serious bodily injury) of Officer Sagner should be vacated because the evidence was insufficient to establish his mental culpability for each of these offenses. After discussing the standard of review, we address each conviction in turn.

## A. Standard of Review

¶ 12    We review the record de novo to determine whether the evidence was sufficient to sustain the defendant's conviction. *Clark v. People*, 232 P.3d 1287, 1291 (Colo. 2010). Evidence will sustain a conviction if the direct and circumstantial evidence, "'when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt.'" *Id.* (citation omitted).

¶ 13    In applying this "substantial evidence" test, we must, as relevant here, give the prosecution the benefit of every reasonable inference that can be fairly drawn from the evidence and refrain from acting as a thirteenth juror. *People v. Gonzales*, 666 P.2d 123, 128 (Colo. 1983). Because direct proof of the defendant's state of mind is rarely available, a defendant's mental culpability "can, and often must, be proved by circumstantial evidence." *People v. Johnson*, 2024 CO 32, ¶ 36 (quoting *People in Interest of J.O.*, 2022 COA 65M, ¶ 20).

### B. Attempted First Degree Murder (After Deliberation)

¶ 14 Cotter contends that his conviction for attempted first degree murder (after deliberation) of Officer Sagner should be vacated because the prosecution failed to prove deliberation or intent. Specifically, he argues that the jury could not reasonably infer deliberation or intent because the "evidence established that Mr. Cotter only shot toward [the approaching officer] and was unaware that Sagner was behind the pillar."

#### 1. Applicable Law

¶ 15 For criminal attempt, the prosecution must prove that the defendant took "a substantial step toward the commission of the offense" and possessed "the kind of culpability" required for the underlying offense. § 18-2-101(1), C.R.S. 2025.

¶ 16 A person commits first degree murder (after deliberation) if, "[a]fter deliberation and with the intent to cause the death of a person other than himself, he causes the death of that person or of another person." § 18-3-102(1)(a), C.R.S. 2025. The phrase "after deliberation" means "the decision to commit the act has been made after the exercise of reflection and judgment concerning the act. An act committed after deliberation is never one which has been

committed in a hasty or impulsive manner." § 18-3-101(3), C.R.S. 2025. However, "while deliberation requires that a design to kill precede the killing, the length of time required for deliberation need not be long." *People v. Bartowsheski*, 661 P.2d 235, 242 (Colo. 1983). The term "intent" means the defendant's "conscious objective is to cause the specific result proscribed by the statute defining the offense." § 18-1-501(5), C.R.S. 2025.

¶ 17    Evidence that can be considered in determining whether a defendant acted intentionally and after deliberation in committing murder includes, but is not limited to,

- the circumstances surrounding the killing, *Bartowsheski*, 661 P.2d at 242;

- the use of a deadly weapon, *id.* at 241-42;

- the retrieval and preparation of the deadly weapon, *People v. McBride*, 228 P.3d 216, 226-27 (Colo. App. 2009);

- the manner in which the deadly weapon was used, *Bartowsheski*, 661 P.2d at 242; and

- the location of the wounds, *People v. Sanchez*, 253 P.3d 1260, 1262 (Colo. App. 2010).

## 2.   Discussion

¶ 18   The prosecution presented ample evidence from which a reasonable jury could find that Cotter acted with deliberation and intent toward Officer Sanger.

¶ 19   The circumstances surrounding the shooting support the jury's inference of deliberation and intent.  After the police became involved, Cotter texted a friend, "If the cops are where I'm going to I guess I'm dying tonight[.]"  Nevertheless, he returned to A.C.'s house, disregarding police instructions to stay away.  When he heard police sirens and saw flashing lights, Cotter retrieved his gun from the glovebox, loaded and racked it, and then hid behind a fence where he "[didn't] think they saw [him]" and where he could "[catch] them off guard."  As in *McBride*, the evidence is sufficient to support deliberation and intent because Cotter was "brooding the day of the shooting," had sufficient time to reflect on his actions in the minutes before the shooting, and "had to aim and apply pressure to shoot" three times at the officers.  228 P.3d at 226-27.

¶ 20   Cotter insists that this evidence is insufficient as to Officer Sagner because he was "unaware that other officers were in the area behind [the officer he shot]" and "there was no evidence he

8

could see or aimed at Sagner." But a reasonable jury could disagree for three reasons. First, Cotter's own account suggests he was aware of multiple officers. Cotter noted "three police officers pulled up," recalled seeing "their flashlights looking around," and admitted his shot "hit the first one," after which he fired two more shots. Second, while Cotter conceded he aimed at and "hit the first one," circumstantial evidence is sufficient to show he intended to hit the second officer, Sagner. The prosecution showed that Cotter fired three shots at the approaching officers, striking the pillar where Officer Sagner was positioned. Third, insofar as Cotter contends that he intended to shoot only the first officer, the jury was not required to accept his version of events. *See Gonzales*, 666 P.2d at 128. And we will not act as a "thirteenth juror" by crediting his version on appeal. *Id.* "It does not matter that, were we the trier of fact, we might have reached a different conclusion." *Clark*, 232 P.3d at 1291.

¶ 21 Thus, we conclude that the evidence in this case, when viewed in the light most favorable to the prosecution, is sufficient to sustain the conviction for attempted first degree murder (after deliberation) of Officer Sagner.

C.   Attempted First Degree Murder (Extreme Indifference)

¶ 22   Cotter contends that his conviction for attempted first degree murder (extreme indifference) of Officer Sagner should be vacated because the prosecution failed to prove he knowingly created a grave risk to Officer Sagner or manifested extreme indifference to human life generally.  Cotter insists that he was unaware of other officers nearby and directed all three shots toward the first officer.

1.   Applicable Law

¶ 23   To sustain a conviction for attempted extreme indifference murder, there must be evidence from which the jury "can find that the actor was aware he was engaging in conduct strongly corroborative of the firmness of his purpose to complete the commission of the crime of extreme indifference murder." *Montoya v. People*, 2017 CO 40, ¶ 17.

¶ 24   A person commits first degree murder (extreme indifference) if, "[u]nder circumstances evidencing an attitude of universal malice manifesting extreme indifference to the value of human life generally, he knowingly engages in conduct which creates a grave risk of death to a person, or persons, other than himself, and thereby causes the death of another." § 18-3-102(1)(d).  Extreme

indifference murder encompasses both "'acts putting at risk a single victim, without knowing or caring who that may be,' as well as those acts 'put[ting] at grave risk a number of individuals not targeted by the defendant." *People v. Anderson*, 2019 CO 34, ¶ 14 (quoting *Candelaria v. People*, 148 P.3d 178, 182-83 (Colo. 2006)).

¶ 25     The statutory language "universal malice" requires the prosecution to prove that the defendant's conduct objectively demonstrated "a willingness to take human life indiscriminately, without knowing or caring who the victim may be or without having an understandable motive or provocation." *Garcia v. People*, 2023 CO 30, ¶ 16 (quoting *Candelaria*, 148 P.3d at 181). Our supreme court has clarified that "the question for the trier of fact is whether the act by which death is knowingly caused, by its very nature or the surrounding circumstances of its commission, *objectively evidences* such a willingness [to take human life indiscriminately]" and not "[w]hether the conduct in question *actually* endangers more than a single targeted person, or even whether the actor *subjectively intends* to or is *aware* that his conduct may ultimately take life indiscriminately." *Anderson*, ¶ 15 (emphases added).

11

¶ 26 Colorado courts have upheld convictions for attempted or completed extreme indifference murder not only when the defendant misses his intended victim to hit an unintended bystander, *Candelaria*, 148 P.3d at 180, but also when the defendant

- fires a lethal firearm indiscriminately in the general direction of a visible crowd, *Montoya*, ¶ 20;

- fires at the doors of a house full of people, *People v. Ellis*, 30 P.3d 774, 779 (Colo. App. 2001);

- fires at intended targets with nontargets nearby, *People v. Stovall*, 2012 COA 7M, ¶ 40;

- sprays gunfire at an empty car but wounds nearby neighbors inside their homes, *People v. Rubio*, 222 P.3d 355, 359 (Colo. App. 2009); and

- repeatedly shoots at his intended target when bystanders could have been within shooting range, *Anderson*, ¶ 20.

¶ 27 Our supreme court's holding in *Anderson* is instructive. There, the defendant exited his car to fire thirteen times at the officer who pulled him over. *Id.* at ¶¶ 6-7. The evidence did not show anyone else was "in the vicinity during the shooting" — the

12

shooting took place beside a highway around 2 a.m. and the officer was patrolling alone. *Id.* at ¶¶ 5, 8. Still, the court concluded that reasonable jurors could interpret the defendant's "flurry of gunfire aimed in [the officer's] direction," *id.* at ¶ 17, as demonstrating a willingness to take life indiscriminately "because it objectively evidenced a willingness to kill as many as thirteen bystanders within range of the defendant's indiscriminate shooting, or simply because it evidenced a willingness to kill whoever was pursuing him." *Id.* at ¶ 20.

## 2. Discussion

¶ 28 The prosecution presented ample evidence from which a reasonable jury could find Cotter guilty of attempted first degree murder (extreme indifference).

¶ 29 The circumstances of the shooting, along with Cotter's interview statements, support the jury's findings that he demonstrated a willingness to take life indiscriminately and was aware that his actions posed a grave risk to others. Beyond the evidence discussed above, the prosecution introduced testimony about loud footsteps on ice-packed snow and the officers' flashlights repeatedly shining on Cotter's hiding place. Viewing the evidence in

the light most favorable to the prosecution, a reasonable jury could infer "universal malice" because, when Cotter fired three shots after hearing and seeing multiple officers nearby, he "objectively evidenced a willingness to kill as many as [three officers] within range of [his] indiscriminate shooting." *Id.* at ¶ 20. A reasonable jury could also infer Cotter acted knowingly because, after he "hit the first one," knocking him to the ground, he still fired two more shots.

¶ 30    We are not persuaded by Cotter's arguments that he lacked awareness of Officer Sagner because he directed all three shots at the first officer. The jury was not required to credit his statement that he did not see or target Officer Sagner. But even if we were to credit Cotter's claim that he was unaware of Officer Sagner, Colorado courts have upheld convictions for attempted or completed extreme indifference murder in analogous situations — for example, when a defendant sprays gunfire at an empty car but wounds nearby neighbors inside their homes, *Rubio*, 222 P.3d at 358-59, or when a defendant repeatedly shoots at an intended target when bystanders could have been within shooting range, *Anderson*, ¶ 20.

14

¶ 31    Viewing the evidence in the light most favorable to the prosecution, a reasonable jury could find beyond a reasonable doubt that Cotter knowingly created a grave risk to Officer Sagner, under circumstances evincing a willingness to take human life indiscriminately. Thus, sufficient evidence supports the jury's verdict.

### D.    Attempted First Degree Assault (Serious Bodily Injury)

¶ 32    Cotter contends that his conviction for attempted first degree assault (serious bodily injury) of Officer Sagner should be vacated because the prosecution failed to prove intent or deliberation. Again, we disagree.

### 1.    Applicable Law

¶ 33    A person commits attempted first degree assault (serious bodily injury) if, "[w]ith intent to cause serious bodily injury to another person, he causes serious bodily injury to any person by means of a deadly weapon." § 18-3-202(1)(a), C.R.S. 2025. A defendant can possess intent to cause serious bodily injury and death at the same time. *Sanchez*, 253 P.3d at 1264.

## 2.   Discussion

¶ 34   Our earlier analysis of intent for attempted first degree murder (after deliberation) applies with equal force here.  The intent to commit attempted first degree murder necessarily includes the intent to cause serious bodily harm.  Therefore, as discussed above, the evidence in this case, when viewed in the light most favorable to the prosecution, is sufficient to sustain the conviction for attempted first degree assault (serious bodily injury).

## III.   Motion To Suppress

¶ 35   Cotter contends that his convictions should be reversed because the court admitted his involuntary statements, which contributed to the guilty verdicts.  He argues that his statements during the hospital interview were involuntary because the detective "deliberately exploited his mental and physical weakness" since he had blacked out the night before, undergone surgery, received fentanyl, changed his mind about the interview, expressed suicidal thoughts, and generally lacked experience with law enforcement. We disagree.

## A.    Additional Facts

¶ 36    At approximately 6:40 a.m. on the morning after the shooting, a detective went to interview Cotter at the hospital.  A nurse told the detective that Cotter had been given fentanyl but that its effects "should have worn off by then."  But Cotter told the detective he would "answer [his] questions with an attorney present."  So the detective ended the interview and left the hospital.

¶ 37    Around 9:30 a.m., after receiving a text from another officer saying that Cotter now wanted to talk, the detective returned to the hospital to interview Cotter.  At the start of the recorded interview, the detective confirmed why he had returned: "I received a text message that said you had approached the officers and said you do want to make a statement to me.  Is that correct, and do you want to do that without an attorney present?"  Cotter replied, "Yes." When the detective asked who initiated contact, Cotter said, "I had the nurse do it . . . .  I saw [the officers] out the window so I had the nurse grab them."  The detective double-checked, "No one told you 'You have to do this' or anything like that?"  Cotter confirmed, "Just me."  The detective then asked, "Did anyone coerce you, threaten

17

you, intimidate you, or tell you that you have to give a statement to me?"  Cotter answered, "No."

¶ 38    The detective then read Cotter his *Miranda* rights, showing him a written copy to follow along.  Cotter said he understood each right and signed the waiver form.

## B.    Standard of Review

¶ 39    The district court's suppression order "presents a mixed question of fact and law" on review.  *People v. Thompson*, 2021 CO 15, ¶ 15.  Accordingly, we review the court's factual findings for clear error, accepting them if they are "supported by competent evidence, but we assess the legal significance of the facts de novo." *Id.* (citation omitted).  Additionally, when, as here, the challenged interview is video recorded and there are no relevant disputed facts outside of the recording, "we are in essentially the same position as the trial court to determine the question of suppression."  *People v. Taylor*, 2018 CO 35, ¶ 7.  Thus, we may conduct an independent review of the detective's recorded interview to determine whether Cotter's statements should have been suppressed under controlling law.  *See id.*

## C. Applicable Law

¶ 40 Under the Due Process Clauses of the United States and Colorado Constitutions, a defendant's statements must be voluntary to be admitted into evidence. U.S. Const. amends. V, XIV; Colo. Const. art. II, § 25; *Effland v. People*, 240 P.3d 868, 878 (Colo. 2010). The prosecution bears the burden of proving, by a preponderance of the evidence, that the defendant's statements were voluntary. *Effland*, 240 P.3d at 878.

¶ 41 When a defendant challenges the voluntariness of his statements, the critical question on appeal is whether, under the totality of the circumstances, the interviewing officer "actually overbore the defendant's will." *People v. McIntyre*, 2014 CO 39, ¶ 19. To answer this, we follow a two-step inquiry. *People v. Ramadon*, 2013 CO 68, ¶ 20. First, the court must determine whether the totality of the circumstances shows that the police conduct was coercive. *Id.* "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Id.* at ¶ 19 (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). Second, if police conduct was coercive, the court must determine

whether that conduct played a significant role in inducing the statement. *Id.*

¶ 42    Both steps of the voluntariness inquiry require that we weigh the following nonexhaustive factors:

> (1) whether the defendant was in custody;
>
> (2) whether the defendant was free to leave;
>
> (3) whether the defendant was aware of the situation;
>
> (4) whether the police read *Miranda* rights to the defendant;
>
> (5) whether the defendant understood and waived *Miranda* rights;
>
> (6) whether the defendant had an opportunity to confer with counsel or anyone else prior to or during the interrogation;
>
> (7) whether the statement was made during the interrogation or volunteered later;
>
> (8) whether the police threatened [the] defendant or promised anything directly or impliedly;
>
> (9) the method or style of the interrogation;
>
> (10)    the defendant's mental and physical condition just prior to the interrogation;
>
> (11)    the length of the interrogation;

(12)    the location of the interrogation; and

(13)    the physical conditions of the location where the interrogation occurred.

*Id.* at ¶ 20 (quoting *People v. Medina*, 25 P.3d 1216, 1222-23 (Colo. 2001)). "While a defendant's mental condition, by itself and apart from its relationship to official coercion, does not resolve the issue of constitutional voluntariness, the deliberate exploitation of a person's weakness by psychological intimidation can under some circumstances constitute a form of governmental coercion that renders a statement involuntary." *Effland*, 240 P.3d at 877 (quoting *People v. Gennings*, 808 P.2d 839, 844 (Colo. 1991)).

## D.    Discussion

¶ 43    Applying the nonexhaustive factors to this case, we conclude there was no evidence of police coercion. Though Cotter's hospital room was guarded by police, the district court found, and our independent review of the recorded interview confirms, the following:

- Cotter was aware of the situation. He asked about the condition of the officer he shot and requested a lawyer during his first encounter with the detective.

21

- Cotter then voluntarily re-initiated contact with the detective, confirming that he now wanted to make a statement without an attorney present.

- The detective read Cotter his *Miranda* rights and "methodically verified" that Cotter wanted to speak with him voluntarily.

- Cotter understood and waived his *Miranda* rights because the detective read aloud from a physical copy, pointing out key aspects.

- The officers neither threatened Cotter nor directly or impliedly promised him anything. When Cotter asked, "How long will I get for this?" the detective declined to answer.

- The detective's interview remained "conversational" throughout.

- Despite Cotter's injuries, his mental condition appeared adequate. The district court found, and we agree, that his responses were "thoughtful" and "appropriate[]," and his thinking was "complex." For example, when the detective

inaccurately summarized Cotter's answers, Cotter would interject to correct him.

¶ 44 Although Cotter had been given fentanyl before the detective first arrived, a nurse confirmed that, based on the dosage and timing, its effects "should have worn off by" the time of the interview. And, while Cotter may have struggled with suicidal ideation as in *Effland*, there was no evidence of exploitation or intimidation. Unlike in *Effland*, the detective here did not repeatedly ignore Cotter's multiple requests for an attorney, tell Cotter that he was not entitled to an attorney, or confront Cotter with evidence against his will. *Cf. Effland*, 240 P.3d at 878.

¶ 45 For these reasons, the district court did not err by finding that Cotter's statements were voluntary because the totality of the circumstances does not suggest coercive police conduct.

## IV. Evidentiary Issues

¶ 46 We next turn to Cotter's arguments that the district court reversibly erred by admitting 3-D images of the crime scene as demonstrative aids and allowing the prosecutor to use an intoxication pamphlet during cross-examination of the defense toxicology expert.

23

## A. Standard of Review

¶ 47　We review a district court's evidentiary rulings for an abuse of discretion. *People v. Douglas*, 2016 COA 59, ¶ 20. A district court abuses its discretion if its decision is manifestly unreasonable, arbitrary, or unfair, or based on an erroneous understanding or application of the law. *See Margerum v. People*, 2019 CO 100, ¶ 9.

¶ 48　If we discern error under this standard of review, the standard of reversal for preserved evidentiary issues is harmless error. *People v. Summitt*, 132 P.3d 320, 327 (Colo. 2006). The harmless error analysis asks "whether, viewing the evidence as a whole, the contested evidence substantially influenced the verdict or affected the fairness of the trial proceedings." *Id.* "An error in a criminal trial will be disregarded if there is not a reasonable possibility that it contributed to the jury's guilty verdict." *Id.*

## B. Demonstratives Aids of the Incident

¶ 49　Cotter contends that the district court reversibly erred by admitting the prosecution's demonstrative aids of the crime scene. Specifically, Cotter argues that four exhibits "did not accurately reflect the time of day or physical characteristics of the subjects," and that their probative value was low because the jury had access

to the underlying evidence on which the demonstrative aids were based. We are not persuaded.

### 1.    Additional Facts

¶ 50    The prosecution introduced several exhibits created through "FARO," a 3-D scanner software that generates images of the crime scene, including four demonstrative aids in which featureless mannequins had been superimposed onto images. Officer John Tollefson, qualified as an expert in FARO computerized crime scene imaging, explained that FARO produces accurate 3-D representations of the scene and provides precise measurements between reference points identified during the original scan.

¶ 51    After creating the crime scene images with FARO, Officer Tollefson placed featureless mannequins in the images to show the positions of the officer who was shot, Officer Sagner, and Cotter. He based his placements on information from body-camera footage, officers' reports, witness testimony, the bullet's entry point, the officers' heights, and Cotter's interview statements.

¶ 52    Over Cotter's objection, the district court admitted four FARO exhibits as demonstrative aids but excluded others that purported

to show Cotter's perspective or how far Officer Sagner's body protruded from behind the pillar.

¶ 53    When the four FARO exhibits were admitted, the court read the jury a limiting instruction — approved by defense counsel — which explained, "[T]he Court has admitted as demonstrative exhibits those four exhibits only for the purpose of showing the general location of individuals involved in this incident.  You may not consider the exhibits for any other reason."  During Officer Tollefson's testimony, the prosecution repeatedly clarified that these exhibits depicted only general locations, not sight lines, lighting conditions, or perspectives.

## 2.    Applicable Law

¶ 54    Demonstrative aids can include diagrams, maps, computer animations, models, or mock-ups.  *People v. Palacios*, 2018 COA 6M, ¶ 19.  Their purpose is to "illustrate other admitted evidence and thus to render it more comprehensible to the trier of fact."  *Id.* (citation omitted).  Demonstrative aids "should be encouraged since they give the jury and the court a clear comprehension of the physical facts, certainly much clearer than one would be able to

describe in words." *Id.* (quoting *Intermill v. Heumesser*, 391 P.2d 684, 686 (Colo. 1964)).

¶ 55 A demonstrative aid is admissible if the proponent can "(1) authenticate it; (2) show that it is relevant; (3) show that it is a 'fair and accurate representation of the evidence to which it relates'; and (4) show that its probative value is not substantially outweighed by the danger of unfair prejudice." *Douglas*, ¶ 22 (citation omitted). As to fair and accurate representation, a demonstrative aid "need not be exact in every detail, but the important elements must be identical or very similar to the scene." *Id.* at ¶ 45 (citation omitted). Additionally, absent contrary evidence, the jury is presumed to have followed a court's limiting instructions. *See People v. Perez*, 2024 COA 94, ¶ 48.

### 3. Discussion

¶ 56 We are not persuaded that the district court abused its discretion by admitting the four FARO exhibits as demonstrative aids.

¶ 57 Officer Tollefson authenticated the exhibits, and the general location of the parties was relevant to the charged offenses. As to the exhibits' fairness and accuracy, Cotter contends they were

fatally inaccurate because Officer Tollefson did not input Cotter's height, weight, or body type for the featureless mannequin that represented him. However, demonstrative aids "need not be exact in every detail," and Cotter does not explain how omitting these attributes bears on the exhibit's admitted purpose: showing the general locations of parties. *Douglas*, ¶ 45. Additionally, though the exhibits showed daytime conditions, both the court's limiting instruction and the prosecution's examination of Officer Tollefson flagged this discrepancy. Such minor discrepancies do not render the demonstrative aids so misleading that admitting them would amount to an abuse of discretion.

¶ 58     Further, the probative value of the exhibits was not substantially outweighed by any danger of unfair prejudice. The court excluded exhibits purporting to show Cotter's vantage point and sight lines. The admitted exhibits simply helped the jury visualize the general locations of parties at the crime scene — a task not easily accomplished by testimony and body-camera footage alone. Also, absent evidence to the contrary, we presume the jury followed the court's limiting instruction to consider the exhibits only for general locations. *Perez*, ¶ 48.

¶ 59     Even if we assume the district court abused its discretion in admitting the demonstrative aids, we cannot say "the contested evidence substantially influenced the verdict or affected the fairness of the trial proceedings." *Summitt,* 132 P.3d at 327.  As Cotter points out, the jury already had access to the underlying evidence on which the exhibits were based, and Cotter does not claim that these exhibits contradicted the underlying evidence.

¶ 60     In sum, the court did not reversibly err by admitting the four FARO exhibits as demonstrative aids.

## C.     Intoxication Pamphlet

¶ 61     Lastly, Cotter contends that the district court reversibly erred when it allowed the prosecutor to cross-examine the defense's toxicology expert using Professor Kurt Dubowski's intoxication pamphlet because the pamphlet was irrelevant and inadmissible hearsay.  We disagree.

### 1.     Additional Facts

¶ 62     To support the position that Cotter's intoxication negated specific intent, the defense called a toxicology expert to testify about the effects of blood alcohol content (BAC).

¶ 63 The expert explained the significance of Cotter's BAC by referencing the so-called "Dubowski chart," created by Professor Dubowski. She described the chart as a summary of extensive literature on the most common effects of alcohol at various BAC levels. She relied on a 2006 version of the chart, published in a peer-reviewed article.

¶ 64 Using the 2006 chart, the expert testified that Cotter's estimated BAC level of between .11 and .12 indicated that he was "substantially intoxicated by alcohol at the time of the incident." She stated that this BAC level renders people "more likely to do things they wouldn't do if they were sober."

¶ 65 The prosecutor cross-examined the expert with a pamphlet authored by Professor Dubowski, featuring a 1989 version of the chart, apparently prepared as a police training document. The expert testified that she had never reviewed the pamphlet and saw no indication it was peer-reviewed.

¶ 66 Defense counsel objected to the pamphlet, arguing it was irrelevant hearsay. Counsel contended the prosecution needed an expert to establish the learned treatise exception, since the defense expert did not consider the pamphlet authoritative. The district

court overruled the objection, concluding that the defense expert had relied on Professor Dubowski's materials and that the pamphlet, which featured a 1989 version of the chart, qualified as a learned treatise.

¶ 67 The court allowed the prosecutor to have the expert read aloud the following passage from the pamphlet:

> Ethanol does not cause people to perform an act which they fundamentally oppose. But if fear is the only thing keeping them from committing an act, the alcohol consumption will take away the fear and it is more likely that they will commit an act they would not commit when sober. The ethics of robbing a bank are not changed by being drunk.

The pamphlet itself was not admitted as an exhibit, and the jury did not review it.

### 2.    Applicable Law

¶ 68 Hearsay is "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." CRE 801(c). However, "[e]vidence presented to impeach the witness rather than establish the truth of the matter asserted is not hearsay." *Foster v. Ward*, 182 F.3d 1177, 1188 (10th Cir. 1999). A witness who takes the stand puts her

credibility in issue, and the opposing party is entitled to impeach the witness's credibility. *People v. Segovia*, 196 P.3d 1126, 1130 (Colo. 2008).

¶ 69 Under CRE 705, "it is fundamental that an expert witness may be cross-examined concerning the basis of his opinion." *People v. Alward*, 654 P.2d 327, 331 (Colo. App. 1982). This rule allows the cross-examiner to probe the expert's knowledge, elicit the facts underlying the opinion, and explore any other matters that may shed light on the weight to be given to the opinion. *See* 23 Sheila K. Hyatt, *Colorado Practice Series, Evidence Law* § 705:3 (3d ed. 2023). The scope of cross-examination for expert witnesses is traditionally broader than it is with lay witnesses. *Id.*

### 3. Discussion

¶ 70 Although the district court found that Professor Dubowski's intoxication pamphlet was a learned treatise — an exception to the hearsay rule — we may affirm on any ground supported by the record, even if it was not relied on or considered by the district court. *See People v. Aarness*, 150 P.3d 1271, 1277 (Colo. 2006). We conclude that the pamphlet was not offered for the truth of the matter asserted but for impeachment purposes.

¶ 71    The toxicology expert's testimony relied almost exclusively on the work of Professor Dubowski.  Using Professor Dubowski's chart, the expert testified that Cotter was "on the more extreme side of the intoxication curve," indicating that he would have been "more likely to do things [he] wouldn't do if [he was] sober."  In response, the prosecutor introduced Professor Dubowski's pamphlet — not to prove the truth of its statements, but to challenge the expert's interpretation of the chart and to point out weaknesses in the bases of her testimony.  Contrary to the expert's testimony, the pamphlet indicated that BAC levels above .08 do not "cause people to perform an act which they fundamentally oppose."  As the district court observed, the expert "relied in part on the expertise of Mr. Kurt Dubowski to reach a portion of her conclusion, specifically the chart of intoxication."  Professor Dubowski's own interpretation of his chart, even an older version, was thus relevant for the jury to assess the credibility of the expert's testimony.

¶ 72    Moreover, even if the district court erred by allowing the prosecutor to cross-examine using the pamphlet, the error was harmless.  The contested statement was brief and made up only a small part of the seven-day trial.  *See People v. Daley*, 2021 COA

85, ¶ 98 ("The fact that improperly admitted testimony was brief and fleeting supports a conclusion that it was harmless."). During cross-examination, the expert repeatedly warned that the pamphlet was not peer-reviewed. On redirect, the expert had ample opportunity to clarify and counter the statement. She emphasized the lack of context, noted the progress of research since 1989, and shared an anecdote to demonstrate how BAC affects judgment. Under these circumstances, the challenged statement was not so prejudicial to the expert's testimony that it substantially influenced the verdict or undermined the trial's basic fairness. *Summitt*, 132 P.3d at 327.

¶ 73    Accordingly, the district court did not reversibly err by allowing the prosecution to cross-examine the toxicology expert with Professor Dubowski's pamphlet.

## V.    Disposition

¶ 74    The judgment is affirmed.

JUDGE FREYRE and JUDGE PAWAR concur.